# In the United States Court of Federal Claims

No. 21-1527
(Filed:  3 June 2024)

```
*****************************************
CONFEDERATED TRIBES AND BANDS          *
OF THE YAKAMA NATION, et al.,          *
                                        *
                  Plaintiffs,           *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
                  Defendant.            *
                                        *
*****************************************
```

        *Ethan Jones*, Attorney, with whom was *Marcus Shirzad*, Of Counsel, Yakama Nation Office of Legal Counsel, of Toppenish, WA, with whom were *Josh Newton*, Partner, and *Sarah R. Monkton*, Of Counsel, Best Best & Krieger LLP, of Bend, Oregon, for plaintiffs.

        *Peter Kryn Dykema*, Senior Trial Attorney, Environment and Natural Resources Division, Natural Resources Section, with whom was *Todd Kim*, Assistant Attorney General, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

        In 2015, the Cougar Creek Fire spread to the Yakama Forest on the Yakama Reservation in Washington State.  The forest, held in trust by the United States for the Yakama Tribe, suffered alleged damages in excess of $10 million.  Confederated Tribes and Bands of the Yakama Nation and co-plaintiff Yakama Forest Products contend the government breached its duties to maintain the forest under the National Indian Forest Resources Management Act and various other statutes and regulations, which resulted in the alleged damages.  In the alternative, plaintiffs argue the government's failure to devote resources to wildfire suppression resulted in a compensable taking of the Tribe's land.  This is the second case the Tribe has pending with the Court alleging the government's breach of trust with respect to the Yakama Forest.  In 2019, plaintiffs brought their first case, *Yakama I*, alleging the government breached its duties to maintain a sustained yield of timber pursuant to both an 1855 treaty with the Tribe and the same statutory and regulatory scheme purported to establish a duty here.  *Confederated Tribes & Bands of the Yakama Nation v. United States* (*Yakama I*), 153 Fed. Cl. 676 (2021).  There, the Court denied the motion to dismiss, finding the statutes, regulations, and treaties imposed money-mandating duties sufficient to maintain jurisdiction under the Tucker Act.  In the instant case, the government moves to dismiss, alleging the Tribe was required to bring this suit at the

same time as *Yakama I* and contending the alleged breach of duties do not fall within the statute of limitations. Alternatively, the government alleges the cited statutes and regulations do not establish specific, money-mandating fiduciary duties, and the government's omissions cannot give rise to a takings claim. The government notably makes analogous arguments to those recently addressed in another case, *Confederated Tribes of the Colville Rsrv. v. United States*, No. 21-1664, (Fed. Cl. May 30, 2024), where the court granted in part and denied in part a similar motion, determining the same forestry statutes and regulations cited here do indeed impose specific and money-mandating fiduciary duties. For the following reasons, the Court grants in part and denies in part the government's Motion to Dismiss. On plaintiff's breach of trust claim, the Court denies in part, finding plaintiffs have pled a plausible and compensable breach of duty. The Court grants in part to the extent plaintiffs' claim relies on a breach of duty occurring prior to a 2013 settlement agreement. On plaintiffs' takings claim, the Court denies in part to the extent plaintiffs' claim is based on the government's actions resulting in the accumulation of slash piles in the Yakama Forest. The Court grants in part to the extent plaintiffs' claim is based on general forest mismanagement and the reallocation of firefighting resources.

## I.    Factual Background

The Court presents the facts drawn from plaintiffs' Complaint, "drawing all inferences in [plaintiffs'] favor . . . ." *See First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1288 (Fed. Cir. 1999) (noting an obligation of courts to "construe the complaint broadly [by] drawing all inferences in [plaintiffs'] favor" at the motion to dismiss stage). The Court previously outlined facts relevant to this case in *Yakama I*. Plaintiffs' current allegations differ from their previous allegations, yet some of the underlying factual background related to forest management is the same. The relevant facts from *Yakama I* are reproduced below.

> Plaintiff Yakama Nation is an Indian tribe federally recognized under the Treaty with the Yakamas, dated June 9, 1855. Compl., ECF No. 1 ("Compl."), at ¶ 3. The Treaty created the 1.4 million-acre Yakama Reservation ("Reservation") in south-central Washington state, approximately 650,000 acres of which are forested lands ("Yakama Forest" or "Forest"). *Id.* at ¶¶ 2, 3, 6. The Reservation is located on the traditional homeland of the Tribes comprising the Yakama Nation, which they have occupied "since time immemorial." Pls.' Resp. to Mot. to Dismiss, ECF No. 14 ("Pls.' Resp."), at 7. Plaintiffs' claim centers on the government's commitments to the Tribe in managing the extensive forest resources on this land. Compl. at ¶ 10–14.
> . . . .
> The United States holds in trust all tribal forest land on the Yakama Reservation. Compl. ¶ 5; *see also* 25 U.S.C. § 3101(2) ("[T]he United States has a trust responsibility toward Indian forest lands.").
> . . . .
> Plaintiff Yakama Forest Projects ("YFP") is a tribal corporation wholly owned by the Yakama Nation. Compl. at ¶ 4. The Tribe incorporated YFP in 1995 to "promote the development and utilization of the Reservation's timber resources on a sustained yield basis." *Id.* The Tribe intended YFP to create jobs for tribal

members by operating a commercial log sort yard and sawmill on the Reservation. *Id.* The YFP sawmill's "principal log supply comes from the Yakama Nation's forest land," making the mill's productivity dependent on the government's management of the Yakama Forest. *Id.*; *see also* Tr. at 100:9–12 (plaintiffs noting YFP only processes logs "from off-reservation sources in very limited circumstances because it's just not economically viable.").

The United States Department of the Interior's ("Interior") Bureau of Indian Affairs ("BIA") manages the Tribe's forest resources. Compl. at ¶ 8; 25 U.S.C. §§ 406–407; 25 U.S.C. § 5109; 25 U.S.C. §§ 3101–3120. It does so pursuant to a Forest Management Plan ("FMP"), the "principal document, approved by the secretary . . . which provides for the regulation of the detailed, multiple use operation of Indian forest land." 25 U.S.C. § 3103(5). The current operative FMP for the Yakama Forest was approved by the Secretary in 2005 ("2005 FMP"). Compl. ¶ 8–9.

The 2005 FMP prescribes the Yakama Forest's current management process and objectives. *See* 2005 FMP at 11 (discussing the FMP's "mission, goals, objectives"). The plan sets, *inter alia*, harvest goals and schedules, *id.* at 126, silviculture prescriptions, *id.* at 125, and forest-fire-control measures, *id.* at 110.
. . . .
The United States began its major commercial timber harvesting program in the Yakama Forest following the outbreak of World War II. Pls.' Resp. at 9. The BIA first prepared a Timber Management Plan specifying which portions of the Yakama Forest were subject to harvest each year. *Id.* Soon after adoption of the plan, "[i]ntensive federal forest management" to increase timber harvests began. *Id.* The Tribe's reliance on forest resources, and the income it created, grew steadily with the increase of federal timber harvests. *See id.*
. . . .
In 2014 the BIA also assembled a team of federal and private experts, known as the "Tiger Team," to "conduct a review of the Yakama Forestry Program." Pls.' Resp. at 16. This "Tiger Team" released its final report on 29 January 2015, which was signed by the director of the BIA. *Id.* In the Report's cover letter, the BIA director noted "key tasks require immediate attention and advised the BIA Northwest Regional Director it is now the responsibility of the Northwest Region to oversee this effort to ensure the Yakama Agency begins to implement the action items." *Id.* (internal quotation and alteration marks omitted). Plaintiffs point to a "remarkable admission" from the Tiger Team Report: "certain events over the past few years have allowed the BIA's Yakama Forestry Program to diminish in its capacity to the point that it is on the verge of collapse." *Id.* (original emphasis and internal alteration marks omitted).

*Confederated Tribes & Bands of the Yakama Nation v. United States*, 153 Fed. Cl. 676, 681–84 (2021).

Plaintiffs' instant Complaint further alleges facts related to the Cougar Creek Fire key to the issues in this case. For example, plaintiffs note the Tiger Team report addressed fire risk

concerns in the Yakama Forest, stating "[s]lash piles from past timber sales are so numerous that they are . . . creating a tremendous wildfire hazard," and "all slash piles represent a threat to the Yakama forest in the form of excessive fuel loading in the event of a wildfire." Pl.'s Resp. Mot. Dismiss ("Pls.' Resp.") at 5–6, ECF No. 42. The report additionally states: "[O]nce they start burning[,] [slash piles] prove extremely difficult to extinguish," and "slash piles present a significant safety risk to wildland firefighters and severely complicate fire suppression efforts on the Yakama forest." *Id.* at 6. Plaintiffs allege the United States failed to dispose of the slash piles as far back as 1998. *Id.* at 4.

The Yakama Forest has also been subject to other factors allegedly increasing its susceptibility to fires, including infestations of "Mountain Pine Beetle, Spruce Budworm, and Dwarf Mistletoe that stress trees" and thick duff layers on the Yakama forest floor, "crowding out fire resistant tree species in favor of fir species . . . susceptible to fire when those duff beds burn." *Id.* The Yakama Nation also contracted with the United States Fuels Management program to conduct fuel treatments in the early 2000s, but the program was partially defunded in 2010. *Id.*

On 10 August 2015, lightning struck near the Yakama Forest and ignited the Cougar Creek Fire. *Id.* The Yakama Nation contracted with the United States Wildland Fire Management Program to fight the fires in Yakama Forest. *Id.* at 4. The government initially devoted over 300 firefighters to suppress the fire but reassigned many of the firefighters to other wildfires before the Cougar Creek Fire was suppressed. *Id.* at 4–5. The Cougar Creek Fire ultimately burned 41,530 acres in the Yakama Reservation. Second Am. Compl. at 7, ECF No. 44.

## II.    **Procedural History**

Plaintiffs filed their Complaint on 30 June 2021 asserting the government breached its trust with the Yakama Tribe. Compl., ECF No. 1. The Court granted multiple motions for extension of time to answer as the parties engaged in settlement discussions. *See* Order, ECF. Nos. 7, 9, 11, 13, 17. The Court then granted a motion for referral to alternative dispute resolution (ADR) on 24 March 2022. Order, ECF No. 19. After unsuccessful ADR, plaintiffs filed an amended complaint on 22 September 2022, which added a new count alleging a takings claim in addition to the breach of trust claim. Am. Compl., ECF No. 30. The government filed a motion to dismiss on 23 November 2022. Mot. Dismiss, ECF No. 31. Plaintiffs filed their Response on 18 February 2023. Pls.' Resp. Mot. Dismiss, ECF No. 33. The government replied on 7 April 2023. Reply. Mot. Dismiss, ECF No. 34.

On 25 July 2023, the parties and the Court held a status conference. The parties agreed (1) plaintiffs could submit a second amended complaint following the Supreme Court's decision in *Arizona v. Navajo Nation* (*Navajo III*), 143 S. Ct. 1804 (2023), and (2) the government would file a renewed Motion to Dismiss based on the newly amended complaint and addressing any implications from *Navajo III*. Plaintiffs filed their Stipulated Motion to File a Second Amended Complaint on 27 July 2023, including a copy of their new complaint attached as Exhibit A. Stipulated Mot. File Second Am. Compl., ECF No. 38. On 27 July 2023, the Court struck ECF Nos. 31, 33, and 34 from the record, ordered new briefing addressing the Supreme Court's recent

decision in *Arizona v. Navajo Nation*, 143 S. Ct. 1804 (2023), and granted plaintiffs' Stipulated Motion to File a Second Amended Complaint. Order, ECF No. 40. The government filed a renewed Motion to Dismiss on 18 August 2023. Mot. to Dismiss ("Gov't's Renewed MTD"), ECF No. 41. Plaintiffs responded on 1 September 2023, and the government replied on 8 September 2023. Pls.' Resp. to Mot. Dismiss ("Pls.' Resp."), ECF No. 42; Reply in Supp. of Mot. Dismiss ("Gov't's Reply"), ECF No. 43. The Court held oral argument in Yakima, Washington on 4 December 2023. *See* Order, ECF No. 45.

## III.   Parties' Arguments

The government contends plaintiffs' claims fail on four grounds: (1) plaintiffs' Complaint fails to allege breach of any statutes and regulations with money-mandating duties; (2) plaintiffs' Complaint fails to allege governmental actions and inactions satisfying the causation and appropriation standards for a takings claim; (3) plaintiffs' Complaint was not filed within the Court's six-year statute of limitations or, alternatively, plaintiffs waived their claims pursuant to a settlement agreement; and (4) plaintiffs' claims are barred by the doctrine against claim splitting. The government does not clearly differentiate its arguments pursuant to RCFC 12(b)(1) and 12(b)(6). For example, the government presents no additional arguments beyond RCFC 12(b)(1) against plaintiffs' Breach of Trust claim. *See* Gov't's Renewed MTD. Plaintiffs argue "[i]f the Court denies the United States' Rule 12(b)(1) motion, it should also deny its Rule 12(b)(6) motion because the Court will have necessarily concluded that Plaintiffs have stated a plausible claim for relief." Pls.' Resp. at 17. At oral argument, the government confirmed it agreed with plaintiffs' argument subject-matter jurisdiction and plausibility rise and fall together in this case. 4 Dec. 2023 Oral Arg. Transcript ("Tr.") at 9:1–12, ECF No. 47. To the extent the parties' legal arguments under RCFC 12(b)(1) are analogous to those under RCFC 12(b)(6), the Court addresses both together, considering factual allegations under the appropriate standards outlined *infra* Section IV.

### A.   The Government's Arguments Plaintiffs Fail to Establish a Breach of Trust Claim Under the *Navajo II* Two-Step Test

The government alleges plaintiffs' first count for breach of trust should be dismissed for lack of subject-matter jurisdiction under the two-step test established in *Navajo I* and confirmed in *Navajo II* ("the *Navajo* test"). *United States v. Navajo Nation* (*Navajo I*), 537 U.S. 488 (2003); *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287 (2009). Under step one of the *Navajo* test, the Government argues Yakama has failed to identify statutory or regulatory provisions which "impose money-mandating fiduciary duties on the United States with respect to biomass accumulation, fire hazard reduction (e.g., fuels reduction, firebreaks, prescribed burns, and insect and disease control), wildfire prevention programs, firefighting equipment and fire detection systems, wildfire readiness, fire suppression tactics, or the allocation of resources for fire-fighting on the Yakama Reservation." Gov't's Renewed MTD at 20–22 (citing *Navajo II*, 556 U.S. 287, 290–91 (2009)). The government asserts the Supreme Court's recent decision in *Navajo III* clarifies "the court may not infer a duty not explicitly stated in a statute or regulation." *Id.* at 22–23 (citing *United States v. Navajo Nation* (*Navajo III*), 143 S. Ct. 1804, 1813 (2023)). Under step two of the *Navajo II* test, the government argues many of the sections lack "language expressly or impliedly mandating the payment of money damages." Gov't's Renewed MTD at

27.  Plaintiffs respond *Mitchell II* established many of the alleged statutes at issue here were money mandating and "[t]he other statutes and regulations that [p]laintiffs' rely upon only further strengthen the United States' trust duties to manage and suppress wildfires in Indian forests."  Pls.' Resp. at 15–16.  The government replies:  "*Mitchell II* found money-mandating duties relating to the harvest and sale of Tribal timber . . . [but] involved no alleged duties to prevent or suppress forest fires—a very different subject."  Gov't's Reply at 13.

Plaintiffs contend various statutes and regulations related to the government's maintaining of tribal forest lands establish a duty encompassing forest fire prevention.  Pls.' Resp. at 10–11.  Based on the language in NIFRMA, the statutes assessed in *Mitchell II*, and various other provisions related to the government's relationship with the Yakama Forest, plaintiffs allege the government had an explicit duty to prevent wildfire risk.  *Id.* at 10–11.  According to plaintiffs, "[t]he relevant inquiry is whether the government's statutory directive 'bears the hallmarks of a "conventional fiduciary relationship"' with the Indian tribe."  *Id.* at 9 (quoting *Navajo II*, 556 U.S. at 301).  The duties derived from plaintiffs' cited statutes and regulations discuss duties for timber management, which plaintiffs allege "impose fiduciary duties . . . to manage and protect the Yakama Forest from wildfire."  *Id.* at 11.  Plaintiffs contend "[w]hen the Cougar Creek Fire ignited in 2015, it did not burn through a healthy, well-managed forest."  *Id.* at 14.  These statutes and regulations, plaintiffs allege, are "based, in part, on the same comprehensive statutory and regulatory framework . . . that the Supreme Court reviewed in *Mitchell II* and concluded to be money mandating."  *Id.* at 16 (citing *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, 222 (1983)).

## B.    The Government's Argument Plaintiffs Fail to State a Plausible Takings Claim Under the *Ridge Line* Test

Both parties cite *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003) as the appropriate legal standard for plaintiffs' takings claim.  Gov't's Renewed MTD at 10 (citing *Ridge Line*, 346 F.3d 1346); Pls.' Resp. at 35 (citing *Ridge Line*, 346 F.3d at 1355–56).  The two-part test in *Ridge Line* requires plaintiffs to show causation and appropriation.  *Ridge Line*, 346 F.3d at 1355–56.  Under this test, the government argues plaintiffs' claim fails for lack of causation under *Cary v. United States*, where the court found a third-party hunter's negligent ignition of a forest fire was a superseding cause of a fire that damaged plaintiffs' property.  Gov't's Renewed MTD at 11–12 (citing *Cary v. United States*, 552 F.3d 1373 (Fed. Cir. 2009)).  The government argues, as in *Cary*, "[t]he only relevant direct, natural, or probable result of the [government] policies pleaded by the landowners was a heightened risk, not a wildfire." *Id.* at 13 (quoting *Cary*, 552 F.3d at 1378).  The government also argues its actions were not intentional and therefore do not rise to the level of appropriation.  *Id.* at 15–16.

In response, plaintiffs allege the United States caused an invasion of protected property interests because the Cougar Creek Fire was the direct, natural, or probable result of the United States' failure to manage the Yakama Forest for wildfire risk; its decision to withdraw fire suppression resources from Cougar Creek Fire; its failure to remove slash piles; and its failure to conduct thinning or prescribed burn operations.  Pls.' Resp. at 36.  Plaintiffs additionally argue "the United States' fire suppression tactics caused an invasion of Plaintiffs' protected property interests" because it is similar to *Trinco*, where "the U.S. Forest Service's decision to light fires

- 6 -

adjacent to Trinco's property in order to suppress an ongoing wildfire could result in a compensable taking." *Id.* at 38 (citing *Trinco v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013)). Plaintiffs assert "a federal fire-fighting agency's suppression tactics create a triable issue of fact for an inverse condemnation claim." *Id.* Plaintiffs conclude "[p]laintiffs have plausibly alleged that the nature and extent of the invasion of its forest lands by the Cougar Creek Fire was the "likely, foreseeable result" of the United States' actions (and inactions) before and after the fire started." *Id.* at 39. Plaintiffs further allege these failures fulfill the appropriation requirement because they "preempted Plaintiffs' right to enjoy the Yakama Forest, and all the benefits it offers, for an extended period of time." *Id.* Here, plaintiffs argue, "[t]he United States had an affirmative duty imposed by Congress" and thus "it is irrelevant whether the United States' failures to meet its duties to act were caused by federal action or inaction." *Id.* at 41. Plaintiffs further contend "[r]esolving these material factual disputes is inappropriate at this early stage of the litigation—when the Court must draw all reasonable inferences in favor of the plaintiff." *Id.* at 43.

### C.     The Government's Argument Plaintiffs' Claims Are Untimely or, Alternatively, Plaintiffs Waived Their Claims Under the Yakama Tribal Trust Settlement

The government alleges eight of plaintiffs' ten claims accrued prior to six years before plaintiffs' 30 June 2021 filing date. Gov't's Renewed MTD at 32–33. "Specifically, these are [p]laintiffs' claims that the United States failed to (1) manage the forest in accordance with principles of sustained yield, (2) maintain timber productivity, (3) sell timber, (4) remove accumulated biomass, (5) reduce fire hazards (e.g., fuels reduction, firebreak construction, prescribed burning, and insect and disease control), (6) conduct an adequate wildfire prevention program, (7) acquire and maintain adequate firefighting equipment and fire detection systems, and (8) maintain an adequate level of wildfire readiness." *Id.* (citing Second Am. Compl. ¶ 22 (a)–(g), (j)). The government alleges plaintiffs knew or should have known of the government's mismanagement in the lead up to the 2015 fire and brought its claim at that time, not when "the consequences of the acts [became] most painful." *Id.* at 39 (quoting *Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011)).

The government further argues all claims regarding events before 2013 are barred by a previous settlement agreement. Gov't's Renewed MTD at 41. In 2013, the government contends "[p]laintiff Yakama Nation waived and released . . . 'any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known [or] unknown, regardless of legal theory, for any damages or any equitable or specific release, that are based on harms or violations occurring before the date of the Court's entry of [the] Joint Stipulation of Settlement as an order and that relate to Defendants' management or accounting of [p]laintiff[s'] trust funds or [p]laintiff[s'] non-monetary trust assets or resources." *Id.* at 41–42. The government concludes "to the extent that the Complaint includes claims regarding the United States' alleged breaches of trust relating to forest and fire management activities that accrued prior to June 18, 2013, those claims are barred by the doctrine of waiver of release and must be dismissed." *Id.* at 43.

Plaintiffs respond, "in order for a claim to accrue, the plaintiff must have suffered damages." Pls.' Resp. at 22 (citing *Rosebud Sioux Tribe v. United States*, 75 Fed. Cl. 15, 24 (2007)). Plaintiffs argue while some federal actions prior to the fire worsened the subsequent damages, their claims still accrued at the ignition of the fire on 10 August 2015; until plaintiffs sustained damages, there was no case or controversy to present to the court "because [any claim] would rest on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* at 22 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Plaintiffs additionally contend "[p]laintiff Yakama Forest Products was not a party" to the 2013 settlement agreement "and is not bound by its terms, but regardless, the settlement was not fashioned in a way to restrict prospective claims, and this present action alleges damages arising from the 2015 Cougar Creek Fire that fall outside the applicable settlement period." Pls.' Resp. at 26–27. Plaintiffs argue "[p]laintiff Yakama Nation only released claims for damages based on harms suffered *before* the Court's June 18, 2013 entry of the stipulation" and "[t]he harms caused by the Cougar Creek Fire were all incurred more than two years later." *Id.* at 27.

### D.    The Government's Argument Plaintiffs' Impermissibly Split Their Claim from Their 2019 Complaint

The government alleges plaintiffs are claim splitting between *Yakama I* and *Yakama II*. Gov't's Renewed MTD at 27. The government points to the Federal Circuit's language in *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, stating "[i]t is well established that a party may not split a cause of action into separate grounds of recovery and raise the separate grounds in successive lawsuits; instead, a party must raise in a single lawsuit all the grounds of recovery arising from a single transaction or series of transactions that can be brought together." 58 F.3d 616, 619–20 (Fed. Cir. 1995) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982)).

Plaintiffs insist the government's claim splitting allegation fails for lack of final judgment. *Id.* at 20. In addition, plaintiffs differentiate their claims by stating *Yakama I* "[alleged] the United States breached its fiduciary duties by failing to prepare and approve sufficient timber sales by failing to provide an adequate timber supply for Yakama Forest Products, and by failing to manage the Yakama forestry program in a manner that would allow the Yakama Nation to not only receive the stumpage value from its forest lands, but also the benefit of all labor and profit that the Yakama Forest is capable of yielding." *Id.* at 21. Plaintiffs contrast this case from *Yakama I*, alleging here "the United States breached its money mandating trust duties with respect to forest management, fire prevention, fire planning, fire suppression, and did not take steps reasonably necessary to protect the Yakama Forest from loss by fire." *Id.* (citing Second Amended Compl. at 4, 13).

## IV.    Legal Standards Under RCFC 12(b)(1) and 12(b)(6)

When resolving a motion to dismiss under both RCFC 12(b)(1) and 12(b)(6), the Court engages in two independent inquires. *See Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (holding that when considering a motion to dismiss, "the merits of the claim [are] not pertinent to the jurisdictional inquiry"). Although the analyses are distinct, plaintiffs must plead sufficient facts to state a plausible claim *and* establish jurisdiction. *See*

*Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018) ("[T]he Supreme Court's 'plausibility' requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp v. Twombly* . . . and *Ashcroft v. Iqbal* . . . also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).").

### A.     RCFC 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction

When considering a motion to dismiss under RCFC 12(b)(1), "[a] plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *Inter-Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1337–38 (Fed. Cir. 2020) (quoting *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010)) (internal quotation marks omitted). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).

### 1.     Subject-Matter Jurisdiction Under the Indian Tucker Act

The Indian Tucker Act is a jurisdictional statute—it does not create substantive rights. *See Navajo II*, 556 U.S. 287, 290 (2009) ("Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law."). "A substantive right must be found in some other source of law." *Mitchell II*, 463 U.S. 206, 216 (1983). This Court accordingly may assert Indian Tucker Act jurisdiction over a claim only if plaintiffs: (1) identify a substantive source of law creating fiduciary duties for the government, and allege the government breached those duties; and (2) demonstrate the statute "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." *Inter-Agency Tribal Council of Ariz. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *Navajo II*, 556 U.S. at 291).

### 2.     Subject-Matter Jurisdiction Under 28 U.S.C. § 2501

A claim before the United States Court of Federal Claims is timely if "filed within six years after such claim first accrues." 28 U.S.C. § 2501. The time bar is "jurisdictional," which means it is "more absolute" because it is a limit to Congress's waiver of sovereign immunity. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008). A claim first accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).

When a breach is continuing, the "suit is not barred by the Statute of Limitations, . . . but recovery, if any, may be had only for violations of the alleged agreement which occurred not more than six years before the filing of the petition." *Aktiebolaget Bofors v. United States*, 139 Ct. Cl. 642, 645 (1957). Typically, in a continuing claim case, "the plaintiff's claim could be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United*

*States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997).  "[A] claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."  *Id.* at 1456.

### B.   RCFC 12(b)(6) Motion to Dismiss for Failure to State a Plausible Claim

When considering a motion to dismiss under RCFC 12(b)(6), the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  The Court cannot rely on conclusory statements and legal assertions when determining whether the complaint contains sufficient allegations to plausibly claim breach of trust.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  "A complaint should not be dismissed for failure to state a claim, 'unless the complaint fails to "state a claim to relief that is plausible on its face."'"  *Inter-Tribal Council of Ariz.*, 956 F.3d at 1338 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint is facially plausible if the court can "draw the reasonable inference that the [d]efendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### V.   *Navajo* Step One:  Whether Plaintiffs Allege Statutes and Regulations Establishing Specific Fiduciary Duties

Plaintiffs allege the government breached its trust relationship with the Yakama Tribe by failing to meet statutory and regulatory duties to maintain the Yakama Forest.  Pls.' Resp. at 9–11.  In order for plaintiffs to establish a breach of trust, the Supreme Court requires tribes to satisfy the two-step jurisdictional test established in *Navajo I* and confirmed in *Navajo II*.  *See Navajo I*, 537 U.S. 488, 506 (2003); *Navajo II*, 556 U.S. 287, 290–91 (2009).  The Court previously outlined the first step of the *Navajo* test in *Yakama I*:

> The first step of the *Navajo II* jurisdictional analysis requires plaintiffs "identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the government has failed faithfully to perform those duties."  *Navajo II*, 556 U.S. at 290.  The substantive law must establish *specific* fiduciary responsibilities the government owes to the tribe under an explicit statutory provision.  *See Inter-Agency Tribal Council of Ariz. Inc.*, 956 F.3d at 1338 (quoting *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1039–40 (Fed. Cir. 2012)) ("'[T]ribes must point to specific statutes [or] regulations that 'establish the fiduciary relationship and define the contours of the [government's] fiduciary responsibilities.'").

> A statutorily created general-trust relationship between the government and the Tribe does not, by itself, establish fiduciary duties sufficient for Indian Tucker Act jurisdiction.  *See United States v. Mitchell,* 445 U.S. 535 (1980) ("*Mitchell I*") (holding the General Allotment Act establishes a "limited trust" relationship between the Government and the tribe, and does not create specific fiduciary duties the government must fulfill).  Plaintiff must point to specific statutory language defining the government's fiduciary role.  *Navajo II*, 556 U.S. at 290.  Such duties

often arise when the government has "comprehensive control" over the trust's corpus. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (observing the government's physical occupation of tribal land inherently leads to government "control at least as plenary as its authority over the timber in *Mitchell II*"). Comprehensive control, however, is not always dispositive of a fiduciary relationship. *See Hopi Tribe v. United States*, 782 F.3d 662, 671 (Fed. Cir. 2015) (holding the government's comprehensive control over the Hopi Tribe's water system did not create a fiduciary relationship). The relevant inquiry is whether the government's statutory directive "bears the hallmarks of a 'conventional fiduciary relationship,'" with the tribe. *Navajo II*, 556 U.S. at 301 (quoting *White Mountain Apache*, 537 U.S., at 473).

The fiduciary responsibilities must flow from the statutory or regulatory language itself. *See Hopi Tribe*, 782 F.3d at 667 ("[T]he United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation."). Common law principles—which are often used to define the contours of a fiduciary relationship in other contexts—cannot serve such a purpose at this stage of an Indian Tucker Act jurisdictional analysis. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("The common law of trusts does not override the specific trust-creating statute and regulations."). Ultimately, the Court must "train on specific rights-creating or duty-imposing statutory or regulatory prescriptions" when considering whether the statute creates a sufficient fiduciary relationship for Indian Tucker Act jurisdiction. *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*").

*Yakama I*, 153 Fed. Cl. 676, 694 (2021). Under this standard, the Court turns to the statutes and regulations cited by plaintiffs to determine whether plaintiffs have alleged breach of a specific rights-creating or duty imposing prescription. *See also Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353 (Fed. Cir. 2024) ("[A] Tribe first 'must identify a substantive source of law that establishes specific fiduciary or other duties'" (quoting *Navajo I*, 537 U.S. at 506)).

## A.   Whether NIFRMA and Its Implementing Regulations Establish Specific Fiduciary Duties

The government argues plaintiffs' allegation of breach under NIFRMA and BIA's corresponding implementing regulations do not mention wildfire prevention and accordingly cannot establish a specific fiduciary duty as required under the *Navajo* test. *Id.* at 24–26. Plaintiffs cite to 25 U.S.C. § 3103(4)(D) and § 3104 as establishing a "duty to manage the Yakama Forest to prevent wildfire risk" and a "duty to suppress wildfires that occur throughout the Yakama Forest." Pls.' Resp. at 12–13 (emphasis omitted). Specifically, plaintiffs allege the government "failed to adequately address the substantial fire hazard, manage accumulating fuel loads, remove accumulated biomass, defend against insects and disease, dispose of slash piles from past timber sales, perform essential fuel treatments such as thinning and prescribed burning, construct adequate firebreaks, carry out adequate timber harvests . . . , adequately analyze the wildfire risk, prepare and plan for its wildfire response, or acquire necessary fire-fighting and

detection equipment."[1]  Pls.' Resp. at 13 (quoting Second Am. Compl. at 9).  Each of these duties plaintiffs contend "fall[s] within the comprehensive federal forest management framework that was recognized by the Supreme Court in *Mitchell II* and codified in NIFRMA."  *Id.*  At oral argument, plaintiffs further clarified the relevant implementing regulations (25 C.F.R. Part 163), which largely or completely mirror NIFRMA, do not add any further duties beyond those required by NIFRMA and are "belts and suspenders" to the alleged statutory duties.  Tr. at 67:12–68:9; Tr. at 65:15–66:12 ("THE COURT:  [The regulations] mirror the language from NIFRMA[?]  [PLAINTIFFS]:  Correct.  THE COURT:  . . . So it's underlying that NIFRMA is the mandatory language.  [PLAINTIFFS]:  Yes, Your Honor.").  The Court accordingly addresses the congressionally established duties under NIFRMA, recognizing the same duties may also stem from provisions mirrored in BIA regulations.  In reviewing the statutory language of NIFRMA, the Court analyzes the statutory requirements of NIFRMA to determine whether the government's trust duties encompass wildfire prevention and suppression.  *See Navajo II*, 556 U.S. at 290.

### 1.    Whether NIFRMA Itself Establishes Mandatory Duties to Wildfire Suppression and Prevention

Plaintiffs propose a nesting doll of statutory interpretation to arrive at the government's alleged duties to the Yakama Forest, asserting the broad forestry duties required by NIFRMA are narrowed by specific activities outlined in the statute's Definitions section.  Pls.' Resp. at 18–19.  Section 3104 of NIFRMA is titled "Management of Indian forest land."  Subsection (a) of § 3104 describes the scope of "management activities" to be undertaken by the government:

> The secretary shall undertake *forest land management activities* on Indian forest land, either directly or through contracts, cooperative agreements, or grants under the Indian Self-Determination Act.

---

[1] Plaintiffs' Second Amended Complaint only alleges one breach of trust count.  Second Am. Compl. ¶¶ 20–25.  Plaintiffs characterize the government's duties as "fiduciary obligations to protect and preserve the Yakama Forest from damages caused by wildfire . . . [and] duties with respect to forest management, fire prevention, fire planning, and fire suppression," contending the government "did not take the steps reasonably necessary to protect the trust resource from loss by fire."  *Id.* ¶ 22; *see also id.* ¶ 21 ("[The government] has obligated itself, as trustee, to protecting and preserving [plaintiffs'] timber resources against losses from wildfire.").  Despite characterizing the breach of duty as wildfire-based, plaintiffs' Second Amended Complaint lists several breaches of fiduciary duties *not* directly related to wildfires.  *See, e.g., id.* ¶ 21(a)–(b) ("The duty . . . to authorize the felling, cutting, removing . . . [and] to consent to the sale of timber . . . .").  The substance of plaintiffs' Second Amended Complaint, however, relates wholly to an alleged breach of wildfire duties and not every possible breach of duty stemming from the alleged actions.  *See* Second Am. Compl. ¶ 1 ("This action . . . seek[s] money damages . . . for breaches of fiduciary duties . . . arising out of [the government's] failure to adequately maintain and protect the Yakama Forest and its resources from damages caused by the 2015 Cougar Creek Fire.").  Indeed, some of these related duties, such as the duty "to authorize the felling, cutting, removing, and selling" of timber are addressed elsewhere without any reference to wildfire prevention or suppression.  *See Yakama I*, 153 Fed. Cl. 676 (2021).  The Court interprets plaintiffs' Complaint as alleging governmental actions and omissions which amount to a breach of wildfire duties ("forest management, fire prevention, fire planning, and fire suppression . . . to protect the trust resource from loss by fire"), even though these actions may give rise to breaches of other, non-wildfire duties.  *Id.* ¶ 22.  The Court accordingly treats plaintiffs' Second Amended Complaint as alleging the government breached statutory and regulatory duties for "wildfire prevention and suppression."

25 U.S.C. § 3104(a); *see also* 25 C.F.R. § 163.10(a).  Subsection (b) further contextualizes the "[m]anagement objectives" for forest land management:

> Indian *forest land management activities* undertaken by the Secretary shall be designed to achieve . . .
>
> (1)  the development, maintenance, and enhancement of Indian forest land in a perpetually productive state in accordance with the principles of sustained yield and with the standards and objectives set forth in forest management plans by providing effective management and protection through the application of sound silvicultural and economic principles to—
>> (A)  the harvesting of forest products,
>> (B)  forestation,
>> (C)  timber stand improvement, and
>> (D)  other forestry practices;

25 U.S.C. § 3104(b); *see also* 25 C.F.R. § 163.3(b).  The statutory language is notably mandatory ("shall undertake" and "shall be designed to achieve") rather than permissive.

While § 3104 describes mandatory duties, however, the statute does not directly mention fire prevention or suppression duties, nor even the word "fire."  To arrive at the alleged wildfire duties, plaintiffs instead contend the "forest land management activities" which "[t]he secretary shall undertake" are governed by the term's definition.  *See* Pls.' Resp. at 12–13.  The definition of "forest land management activities," located one section prior in § 3103, is long and enumerates several duties within the term's scope; most relevantly, the provision recites:

> For the purposes of this chapter, the term—
> . . . .
> (4) "forest land management activities" means all activities performed in the management of Indian forest lands, including—
>> . . . .
>> (D) protection against *losses from wildfire*, including acquisition and maintenance of *fire fighting* equipment and *fire detection systems*, construction of *firebreaks*, hazard reduction, *prescribed burning, and the development of cooperative wildfire management agreements*;
>> (E) protection against insects and disease, including—
>>> (i) all aspects of detection and evaluation,
>>> (ii) preparation of project proposals containing project description, environmental assessments and statements, and cost-benefit analyses necessary to secure funding,
>>> (iii) field suppression operations, and
>>> (iv) reporting;
>> (F) assessment of damage caused by forest trespass, infestation or fire, including field examination and survey, damage appraisal, investigation assistance, and report, demand letter, and testimony preparation; . . .

25 U.S.C. § 3103(4) (emphases added); *see also* 25 C.F.R. § 163.1.  According to plaintiffs, these "fire" provisions within the Definitions section, as well as the general requirements to maintain forest health, "plainly detail[] the United States' duty to prevent and suppress wildfires within the Yakama Forest."  Pls.' Resp. at 18.

The government contends plaintiffs' statutory and regulatory citations do not establish a duty because a definitions section cannot "create legal obligations or independent causes of action for damages."  Gov't's Renewed MTD at 25.  The government argues these provisions merely "authorize[]" the secretary to act and "[s]uch discretionary language undermines the assertion of a fiduciary duty."  *Id.* at 26 & n.8 (citing *Wolfchild v. United States*, 731 F.3d 1280, 1289 (Fed. Cir. 2013)).  Citing *Evans v. United States*, the government contends "definitions do not create legal obligations or independent causes of actions."  *Id.* at 29 (citing *Evans v. United States*, 107 Fed. Cl. 442, 450 (2012) ("The definitions do not by themselves grant . . . independent rights.")).  To the extent the statute imposes duties, the government stated at oral argument, "the fact [NIFRMA] identif[ies] those land management activities undertaken by the secretary clearly contemplates that there will be . . . Indian forest land management activities not undertaken by the secretary, which is entirely inconsistent with the idea that all such activities are mandatory."  Tr. at 144:12–145:6.  Plaintiffs argue *Evans* is not analogous, as "[u]nlike in *Evans*, [p]laintiffs do not offer . . . a series of definitions . . . as the sole source for the existence of a money mandating trust duty."  Pls.' Resp. at 18.  Instead, plaintiffs allege the definitions "are clearly actionable insofar as they define terms in a separate regulation that establishes a money mandating trust duty," including § 3104.  *Id.* at 18–19.

*Evans*, as in this case, involved a definitions section alleged to establish a governmental duty to a tribe.  This court considered whether a *pro se* plaintiff, the son of an Alaska Native, had adequately alleged the existence of a money-mandating statute or regulation which created a specific duty sufficient to establish jurisdiction over the plaintiff's inheritance claim.  *Evans*ֽ 107 Fed. Cl. at 445–46.  The court indicated in a single line:  "The regulation at 25 C.F.R. § 15.2, titled, 'What definitions do I need to know?' is an alphabetical list of definitions relevant to the probate of certain Indian estates . . . but the definitions do not by themselves grant this, or any other plaintiff, independent rights."  *Id.* at 450.  Although the Court generally agrees with the government a definitions section typically does not establish a duty by itself, the statutory duties here are different than the bare definitions section at issue in *Evans*.  Unlike in *Evans*, where the definitions did not provide any "independent rights" and were disconnected from a duty-imposing statutory provision, the definitions section in NIFRMA provides meaning (i.e., definition) to the mandatory duties defined in § 3104.  In other words, § 3104 states the secretary "shall undertake forest land management activities" using the mandatory language of "shall undertake" and "shall be designed to achieve."  § 3104.  By using the term "forest land management activities," § 3104 adopts the term's corresponding definition from § 3103.  Section 3104 does not require the secretary to undertake "*some* forest land management activities"; it requires the secretary to "undertake forest land management activities," as guided by the objectives in § 3104(b) and as defined by § 3103.  These forest land management activities are defined as including wildfire prevention and suppression duties, including "protection against losses from wildfire . . . and assessment of damage cause by . . . fire."  § 3103(4).  Section 3104 therefore includes the mandate to "undertake [protection against losses from wildfire . . . and assessment of damage caused by . . . fire] on Indian forest land."  § 3104(a); § 3103(4).

- 14 -

Despite acknowledging "shall" in § 3104 is "a term of mandate," the government interprets the statute as permitting the BIA to pursue any subset of the enumerated forest land management activities, making the specific duties non-binding. Tr. at 69:24–70:15. At oral argument, the government stated:

> [The statute] says, You shall undertake forest land management activities. And it's up to the secretary to determine which forest land management activities it will undertake. And that's the specific import of 25 U.S.C. 3104(b)(1), which states that Indian forest land management activities undertaken by the secretary shall be designed to achieve a whole bunch of objectives. . . . Well, that states that some forest land management activities will be undertaken by the secretary and some won't.

*Id.* The government accordingly acknowledged "some forest land management activities *will be undertaken*," *id.* (emphasis added), but also argued "[t]here's nothing specifically mandated by that statement." Tr. at 68:14–69:12; *see also id.* ("[THE COURT:] [W]hat duties does this provision bind the government to? [GOVERNMENT]: To undertaking forest land management activities by its language. THE COURT: Yes. . . . What's that? [GOVERNMENT]: It could be any of dozens of different things that they articulate. THE COURT: Like fire suppression? [GOVERNMENT]: It could be, yes. THE COURT: But that's permissive? [GOVERNMENT]: Absolutely."). The government agrees NIFRMA includes "term[s] of mandate," Tr. at 70:2, and agrees Congress's statutory language requires at least some action by the government, *see* Tr. at 70:13–15 ("[GOVERNMENT:] [S]ome forest land management activities will be undertaken by the secretary and some won't."). As the statutory language is mandatory, the Court is unpersuaded §§ 3104 and 3103, in a vacuum, would not establish a mandatory duty on behalf of the government. § 3104(a) ("[The government shall u]ndertake [protection against losses from wildfire and assessment of damage cause by fire] on Indian forest land."); 3103(4).

NIFRMA, however, includes a final provision, § 3120, which the government alleges prevents NIFRMA from establishing any mandatory duties because it prevents "diminish[ing] or expand[ing]" the trust responsibility of the government. Section 3120 states in full: "Nothing in this chapter shall be construed to diminish or expand the trust responsibility of the United States toward Indian forest lands, or any legal obligation or remedy resulting therefrom." 25 U.S.C. § 3120. According to the government, finding a duty related to wildfire prevention and suppression would "establish new trust duties," as the government was not previously burdened with these wildfire responsibilities. Gov't's Renewed MTD at 25. In *Yakama I*, the Court previously addressed § 3120, interpreting the provision as indicating NIFRMA created no new responsibilities but rather "clarifie[d] what trust duties the government already owes to tribes in managing their timber resources under the other forest management statutes." *Yakama I*, 153 Fed. Cl. at 705. As outlined in *Yakama I*, "Congress . . . clarified the government's fiduciary responsibilities related to the management of tribal forest land when it enacted [NIFRMA] in 1990"; this clarification created no new responsibilities. *Yakama I*, 153 Fed. Cl. at 686; *see also Confederated Tribes of the Colville Rsrv. v. United States*, No. 21-1664, slip op. at 12–13, 19–22 (Fed. Cl. May 30, 2024) (reviewing "the history of the [g]overnment's management of Indian

- 15 -

forests," including more than a century of fire-related forest management regulations, and noting "NIFRMA's prescriptions are a clear clarification of pre-existing duties"). As the government contends, the language of the saving clause is clear: NIFRMA cannot "diminish or expand the [government's] trust responsibility." § 3120. To the extent plaintiffs are alleging a duty beyond the pre-NIFRMA "trust responsibility" of the government, their claims must accordingly fail. § 3120; *see Yakama I*, 153 Fed. Cl. at 705. The only forestry duties which can be gleaned from NIFRMA are therefore those which the statute clarifies from other statutory provisions. § 3120; *Yakama I*, 153 Fed. Cl. at 705.

### 2. Whether NIFRMA Clarifies Wildfire Duties in §§ 406, 407, and 5101, as Interpreted by *Mitchell II*

As NIFRMA cannot establish a duty on its own due to 25 U.S.C. § 3120, the Court next considers whether NIFRMA's wildfire prevention and suppression duties are nevertheless grounded in the forestry statutes invoked in *Mitchell II*, namely 25 U.S.C. §§ 406, 407, and/or 5101. The government, though contending the *Mitchell II* statutes do not encompass wildfire duties, nevertheless agreed at oral argument the case provides some clarity on the responsibilities recognized in NIFRMA:

> THE COURT: Well, but you must admit that NIFRMA understands that there is a trust responsibility towards Indian forest lands.
>
> [GOVERNMENT]: Yes.
>
> THE COURT: What are those?
>
> [GOVERNMENT]: It doesn't say.
>
> THE COURT: So how do we understand what they are in order to hold the government to it?
>
> [GOVERNMENT]: Well, we can look at *Mitchell II*. We can look at the statutes that *Mitchell II* evoked . . . . Congress, in NIFRMA, doesn't purport to define the extent of the trust relationship. In fact, they're saying quite the opposite: We're not trying to expand . . . or constrict it. It does provide guidance to the secretary. But is it money-mandating requirement guidance? No, it's not. At least not with respect to firefighting.

Tr. at 96:7–24. The Court accordingly "look[s] at the statutes that *Mitchell II* evoked" to determine whether the statutes, as clarified by NIFRMA, establish a duty to wildfire prevention and suppression.

The government alleges the *Mitchell II* forestry statutes do not include "specific, rights-creating, duty imposing language" for "fire hazard reduction, wildfire prevention, wildfire readiness, firefighting equipment and detection systems, fire suppression, or the allocation of firefighting resources." Gov't's Renewed MTD at 23 (citing *Navajo III*, 143 S. Ct. at 1813).

Specifically, the government contends "[t]he plain language of these timber sale statutes does not specifically impose duties on the United States for fire hazard reduction, wildfire prevention, wildfire readiness, firefighting equipment and detection systems, fire suppression, or the allocation of firefighting resources." *Id.* The government contends these statutes may provide a duty to fire suppression "in the context of *Yakama I*" and the obligations for sustained yield timber management, but the government maintains there is no duty to wildfire prevention and suppression on its own. Tr. at 53:23–54:11 ("[GOVERNMENT:] [I]f there is a mandatory duty to produce sustained yield . . . handling fire could be a part of that duty."); Tr. at 61:12–19 ("[THE COURT:] But is there not under statute an affirmative duty? [GOVERNMENT]: An affirmative duty to pursue sustained yield? THE COURT: Yes. [GOVERNMENT]: There is. THE COURT: And where is that from? [GOVERNMENT]: In current Section 407 . . . ."). The difference, according to the government, is "a separate duty to prevent and control wildfire is *not* something that Congress has imposed." Tr. at 54:8–11 (emphasis added). Whereas a duty may exist for sustained yield of timber, the government argues finding wildfire-based duties would "imply into a sustained yield obligation[,] . . . [and] you can't imply . . . every conceivable obligation that could have a bearing on sustained yield." Tr. at 54:18–24; Tr. at 61:24–62:5 ("[GOVERNMENT:] [W]hile [§ 407] is entirely permissive that the secretary . . . can set regulations for sales of land, it does require that if he's going to do so, then sustained-yield management should guide those decisions.").

The government notably does not dispute *Mitchell II* found the same statutes alleged here impose some money-mandating fiduciary duties on the government and argues only the statutes do not establish wildfire duties. *See* Gov't's Renewed MTD at 23 ("[T]he Court examined the particular statutes and regulations the plaintiff identified and found that those statutes only specifically created an enforceable duty regarding the sale and harvest of Indian timber."); Tr. at 22:2–7 ("[GOVERNMENT:] [I]f we are to take the Supreme Court at its word that the analysis has to train on specific and express statutory requirements or rights . . . *Mitchell II* dealt with . . . sales of trees."). The Court previously addressed the same money-mandating duties in *Yakama I*:

> As a jurisdictional matter, there is little distinction between the claims at issue in *Mitchell II* and plaintiffs' claim here. Plaintiffs rely on the same statutory and regulatory framework governing Indian-forest management to both define the fiduciary relationship between the government and the Tribe and prescribe the government's specific fiduciary duties owed in managing Indian timber resources. Compl. ¶¶ 11–12. This includes the statutes and regulations analyzed by the Supreme Court in *Mitchell II*. *Id.* at ¶ 11 (citing 25 U.S.C. §§ 406–[40]7, 5109 (previously 25 U.S.C. § 466))

*Yakama I*, 153 Fed. Cl. at 698. At oral argument, the government agreed the Court's decision in *Yakama I* established money-mandating fiduciary duties under §§ 406, 407:

> THE COURT: With respect to [§§ 406 and 407] and . . . *Yakama I*'s discussion of *Mitchell [II]*, didn't the Court . . . find that these statutes plausibly do impose duties and are money-mandating?
>
> [GOVERNMENT]: Yes, Your Honor. But not having to do with fire. . . .

- 17 -

[THE COURT:]   [I]s it not that the government has timber duties and timber responsibilities?

[GOVERNMENT]:  That's correct. . . .

THE COURT:  But the argument is that the government's duties there do not include fire prevention or fire suppression?

[GOVERNEMNT]:  That's correct, Your Honor.  Absolutely.

Tr. at 51:16–52:8.

Plaintiff, however, alleges duties beyond the sustained yield obligations, arguing the government has specific duties to wildfire prevention and suppression.  The Court accordingly turns to the language of the "statutes that *Mitchell II* evoked" to determine whether the statutory language also encompasses wildfire prevention and suppression.  *See* Tr. at 96:7–24 ("THE COURT:  Well, but you must admit that NIFRMA understands . . . there is a trust responsibility towards Indian forest lands.  [GOVERNMENT]:  Yes. . . .  THE COURT:  So how do we understand what they are . . . ?  [GOVERNMENT]:  Well, we can look at *Mitchell II*.  We can look at the statutes that *Mitchell II* evoked . . . .").  Section 406 recites, in relevant part:

> The timber on any Indian land held under a trust or other patent containing restrictions on alienations may be sold by the Secretary of the Interior without the consent of the owners when in his judgment such action is necessary to prevent loss of values resulting from *fire*, insects, disease, windthrow, or other natural catastrophes.

25 U.S.C. § 406(e) (emphasis added).  This provision's reference to sale of timber when "necessary to prevent loss of values resulting from fire" accordingly notes the government has some fire-based responsibilities.  *Id.*

*Mitchell II* provides a helpful analytical framework for determining whether the fire-based provision in § 406(e) amounts to obligations to prevent and suppress wildfires.  In assessing whether §§ 406, 407, and 466 established a duty for sustained yield, the Supreme Court began by recognizing the statutes as a whole do not create "a bare trust" but instead "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians . . . [and] thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities."  *Mitchell II*, 463 U.S. at 224.  Turning to the language specifically, the Supreme Court noted § 406(a) "expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of 'the needs and best interests of the Indian owner and his heirs' and that proceeds from such sales be paid to owners 'or disposed of for their benefit.'"  *Id.* at 224 (quoting § 406(a)).  The Court determined the government's "fiduciary relationship" encompassed the express duties from § 406(a), as confirmed by the government's "elaborate control over forests and property belonging to Indians."  *Id.* at 225 ("All of the necessary elements of a common-law trust are present: a trustee (the United States), a

beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." (citing RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. h (AM. L. INST. 1959))).  The Court therefore held the statutes "clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources."  *Id.* at 226.

In this case, plaintiffs allege the duties to wildfire management and suppression are established, in part, by the same statutes addressed in *Mitchell II*, §§ 406, 407, and 5101 (recodified from § 466).  As the Court stated in *Mitchell II*, these statutes "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians . . . [and] thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities."  *Id.* at 224.  Turning to the specific statutory language at issue in this case, § 406(e) notes a responsibility to sell timber "when . . . such action is necessary to prevent loss of values resulting from *fire*, insects, disease, windthrow, or other natural catastrophes."  25 U.S.C. § 406(e) (emphasis added).  This provision, falling within the statutory provisions the Supreme Court has already noted "establish fiduciary obligations," *id.* at 226, indicates at least some duty to consider fire prevention in managing Indian forestland.  Just as *Mitchell II* recognized the statutory language for sustained yield directly supported the "'comprehensive' responsibilities . . . in managing the harvesting of timber," the language in § 406(e) accordingly establishes at least some responsibility for "prevent[ing] loss of values resulting from fire," imposing at least some fire-based duties, *see* § 406(e).  *Mitchell II*, 463 U.S. at 222.

As § 406 establishes some fire-based duties, the Court turns to NIFRMA for clarity on the extent of the government's duties encompassed within the "prevent[ion] [of] loss of values resulting from fire," § 406(e).[2]  *See Yakama I*, 153 Fed. Cl. at 705.  NIFRMA, as indicated *supra* Section V.A, prescribes "[t]he secretary shall undertake forest land management activities on Indian forest land," § 3104, and defines "forest land management activities" as including "protection against losses from wildfire . . . and assessment of damage cause by . . . fire," § 3103(4).  This provision in NIFRMA accordingly clarifies the duties related to the "prevent[ion] [of] loss of values resulting from fire" under § 406(e).  This interpretation aligns with the Supreme Court's recognition "[t]he language of [§ 406] directly supports the existence of a fiduciary relationship."  *Mitchell II*, 463 U.S. at 224.  Supported by the Supreme Court's analysis in *Mitchell II*, the Court finds §§ 406, 407, and 5101, as clarified by NIFRMA,

---

[2] The Court explained in *Yakama I*, Congress is presumed to be aware of *Mitchell II* when it passed NIFRMA:

> Congress plainly intended for NIFRMA to not alter the Supreme Court's holding in *Mitchell II*.  *See* 1 COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 17.04 (2019) (citing 25 U.S.C. § 3120) ("Express language in both NIFRMA and the Tribal Self-Governance Act of 1994 demonstrates the federal government's continuing trust responsibility for Indian forest lands.").  The Court assumes Congress was aware of the Supreme Court's *Mitchell II* decision when it enacted NIFRMA.  *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law.").

*Yakama I*, 153 Fed. Cl. at 703.  To the extent *Mitchell II* found §§ 406, 407, and 466 "clearly establish fiduciary . . . obligation[s] of the [g]overnment," *Mitchell II*, 463 U.S. at 226, Congress is presumably aware of the Court's interpretation.  *Yakama I*, 153 Fed. Cl. at 703.

accordingly establish a specific fiduciary duties on behalf of the government.[3]  § 406(e); § 3104; § 3103(4); *Mitchell II*, 463 U.S. at 224–26; *Navajo II*, 556 U.S. at 301; *Yakama I*, 153 Fed. Cl. at 705; *Colville*, No. 21-1664, slip op. at 7–8, 18.

Further supporting the Court's conclusions, Judge Meyers indicates in his recent decision, *Confederated Tribes of the Colville Reservation*, the United States has a long-standing history of statutes and regulations "explicitly call[ing] for fire prevention efforts by the [g]overnment."  *Colville*, No. 21-1664, slip op. at 19.  First, 1911 Department of Interior regulations—which the Supreme Court discussed in *Mitchell II*—outline several fire-based duties.  *Id.* (quoting regulations requiring "patrol[ling] . . . districts to prevent and report . . . fires," OFF. INDIAN AFFS., REGULATIONS AND INSTRUCTIONS FOR OFFICERS IN CHARGE OF FORESTS ON INDIAN RESERVATIONS § 3, at 4 (1911)); building "fire lines for the proper protection and administration of the forests," *id.*; and noting "[f]ires caused by lightning are not rare, especially in dry mountain regions. . . [and] a special effort should be made to locate and extinguish any such fires before they are well underway," *id.* § 6, at 7).  Second, regulations issued in 1966 note similar fire-based duties.  *Id.* at 21 (citing regulations which "required the [g]overnment to prevent losses from fires and react to emergencies such as fires," including 25

---

[3] As plaintiffs note, the Court of Federal Claims previously reached a similar conclusion on NIFRMA's fiduciary obligations in *Blackfeet*.  Pls.' Resp. at 10 (citing Op. and Order on Cross-Mots. for Partial Summ. J., *Blackfeet Tribe of the Blackfeet Rsrv. v. United States*, No. 12-429 (Fed. Cl. Aug. 21, 2015), ECF No. 62, *vacated by stipulation*, Order on Mot. Vacate, *Blackfeet*, No. 12-429 (Fed. Cl. Dec. 28, 2017), ECF No. 183).  Although the order was eventually vacated by stipulation, the Court nevertheless considers its reasoning as helpful here, as with any non-binding decision from this court.  Similar to the present case, *Blackfeet* involved wildfire damage to Indian forestland.  *Blackfeet*, No. 12-429, slip op. at 1.  The plaintiff there alleged the government breached specific fiduciary duties found in NIFRMA, the BIA's implementing regulations, and the forestry statutes at issue in *Mitchell II* to perform "essential fuel treatments, timber harvesting, and forest management . . . to protect the Blackfeet Tribe's forest trust lands from the risk of wildfires."  *Id.* at 1–2.  Judge Wheeler wrote:

> Supreme Court precedent is dispositive of the [g]overnment's concerns.  In *Mitchell v. United States*, . . . the Court analyzed the comprehensive scope of the statutes and regulations mandating the [g]overnment's management of tribal forests, covering "virtually every aspect of forest management," and noting the "comprehensive responsibilities of the Federal Government." . . .

> The statutes in question specifically address the obligation of the [g]overnment to prevent "loss of values resulting from fire," 25 U.S.C. § 406(e), tree "thinning," the "use of silvicultural treatments," and "protection against losses from wildfire" through the "construction of firebreaks," 25 U.S.C. § 3103(4).  *See also* 25 C.F.R. § 163.1 (stating the same definitions).  When the statutory structure creates such a comprehensive set of responsibilities, the duties [p]laintiff ascribes to the [g]overnment in its complaint are either explicitly stated or can be fairly inferred from the language of the statutes.  There is no basis for the [g]overnment's contention that every detail of the duties owed to the Tribe must be expressly stated in the statutes.
> . . . .
> The Court's conclusion is that, as a matter of law, the Government has the fiduciary duties alleged in the Tribe's complaint, and that money damages are available for breach of the fiduciary duties.

*Id.* at 2–4.  Although *Blackfeet* did not directly address the effect of § 3120, Judge Wheeler's opinion similarly determined the statute provided specific trust duties for forest management, which necessarily includes a responsibility for wildfire prevention.  Like *Blackfeet*, however, the Court does not reach the merits of whether these duties have been breached.  *Id.* at 4.

C.F.R. §§ 141.4, .7(b), .8(b), .18, .21, .3(a) (1966)).  Third, 1982 regulations "also mandate the [g]overnment perform certain duties to prevent losses from fire as well as fire prevention and suppression duties." *Id.* at 21–22 (citing 25 C.F.R. § 163.21, .4, .7(b), .18, .3(a)(1) (1982)). Fourth, regulations from 1984, which were "in effect at the time of NIFRMA," *id.*, "similarly demonstrate the historical reality that the [g]overnment accepted fire prevention and suppression duties . . . [for] 'the protection of Indian forest resources.'" *Id.* (citing 25 C.F.R. § 163.1, .21(b)–(c), .18, .4, .3(a) (1984)).  This history confirms the Court's analysis of NIFRMA *supra*. NIFRMA did not "diminish or expand" the trust responsibilities of the United States but merely clarified the history of statutes and regulations establishing a duty to wildfire prevention and suppression.  *See* 25 U.S.C. § 3120.  The statutes and regulations provide for "specific rights-creating or duty-imposing statutory or regulatory prescriptions" over forest management which "bear[] the hallmarks of a 'conventional fiduciary relationship'" with Indian forestland.  *Navajo II*, 556 U.S. at 301 (first quoting *Navajo I*, 537 U.S. at 506; and then quoting *White Mountain Apache*, 537 U.S. at 473).  Sections  406, 407, and 5101, as clarified by NIFRMA, accordingly establish specific fiduciary duties on behalf of the government for wildfire prevention and suppression.  25 U.S.C. § 406(e) ("[t]he timber on any Indian land held under trust . . . may be sold . . . [when] such action is necessary to prevent *loss of values resulting from fire*." (emphasis added)); § 3104 ("The secretary shall undertake *forest land management activities* . . . ."); § 3103(4) ("'forest land management activities' means . . . protection against *losses from wildfire*, including acquisition and maintenance of *fire fighting* equipment and *fire detection systems*, construction of *firebreaks*, hazard reduction, *prescribed burning, and the development of cooperative wildfire management agreements*" (emphases added)); *Mitchell II*, 463 U.S. at 224–26; *Navajo II*, 556 U.S. at 301; *Ute Indian Tribe*, 99 F.4th at 1368–69 (citing *White Mountain Apache*, 537 U.S. at 473); *Yakama I*, 153 Fed. Cl. at 705.

## B.    Whether Additional Statutes Establish Specific Fiduciary Duties

Plaintiffs further allege 25 U.S.C. § 196 and 16 U.S.C. § 594, though "permissive" in their language, nevertheless "have an important role to play . . . [in] providing context for the[] mandatory duties."  Tr. at 64:4–16.  Section 196 states in relevant part:

> The President of the United States may from year to year in his discretion under such regulations as he may prescribe authorize the Indians residing on reservations or allotments, the fee to which remains in the United States, to fell, cut, remove, sell or otherwise dispose of the dead timber standing, or fallen, on such reservation or allotment for the sole benefit of such Indian or Indians.

25 U.S.C. § 196.  Section 594 states:

> The Secretary of the Interior is authorized to protect and preserve, from fire, disease, or the ravages of beetles, or other insects, timber owned by the United States upon the public lands, national parks, national monuments, Indian reservations, or other lands under the jurisdiction of the Department of the Interior owned by the United States, either directly or in cooperation with other departments of the Federal Government, with States, or with owners of timber; and appropriations are authorized to be made for such purposes.

16 U.S.C. § 594.  Plaintiff admitted at oral argument §§ 196 and 594 do not impose mandatory duties but instead give "context" to the NIFRMA statutes.  Tr. at 64:4–16 ("THE COURT:  So you agree [Sections] 196 and 594 are permissive.  [PLAINTIFFS]:  Yes, Your Honor.  We still think they have an important role to play in that they're providing context for these mandatory duties that we've already discussed and . . . [NIFRMA] as well as the general Indian forestry . . . regulations.").  The Court agrees with plaintiffs these statutes are part of the "context" of the government's management duties to tribal forestland, particularly considering NIFRMA clarifies duties in §§ 406, 407, and 5101 to wildfire prevention and suppression.  *See supra* Sections V.A–B.  These additional statutes only provide more support for the existence of fire prevention and suppression duties within the scheme clarified by NIFRMA.  As these statutes are not "specific" and "rights-creating or duty-imposing"—and plaintiffs acknowledge as much—they cannot establish a duty under a *Navajo II* analysis alone; upon further development of the record, however, it may be these duties are encompassed within a conventional trust relationship, as discussed *infra* Section VII, *see Navajo III*, 143 S. Ct. 1804 (2023).  *Navajo I*, 537 U.S. at 506; *Navajo II*, 556 U.S. at 290–93.

## VI.   *Navajo* Step Two:  Whether the Cited Statutes and Regulations are Money-Mandating

The second step of the *Navajo* test requires the statutes imposing specific duties on the government to be money-mandating.  The Court outlined the test's second step in *Yakama I*:

> The second step of the *Navajo II* test requires plaintiffs demonstrate the fiduciary duties specifically flow from a money-mandating statute.  *See White Mountain Apache,* 37 U.S. at 472.  The "other source of law need not explicitly provide that the right or duty it creates is enforceable through a suit for damages."  *Navajo II*, 556 U.S. at 290.  Rather, "the statute and regulations must be such that they 'can fairly be interpreted as mandating compensation by the Federal government for the damage sustained.'"  *Roberts v. United States* 745 F.3d 1158, 1162 (Fed. Cir. 2014) (quoting *White Mountain Apache Tribe*, 537 U.S. at 472); *see also White Mountain Apache Tribe*, 537 U.S. at 480 ("The dispositive question, accordingly, is whether the [substantive source of law] . . . is *fairly interpreted* to mandate compensation. . . .") (emphasis added).

> Unlike the first step of the *Navajo II* analysis, in the second step the Court can look to common law trust principles when considering whether the statute provides for damages as a remedy for breach.  *Inter-Tribal Council of Ariz. Inc.*, 956 F.3d at 1338.  These principles can inform the "interpretation of statutes and to determine the scope of liability that Congress has imposed."  *Jicarilla*, 564 U.S. at 177.  Specifically, "principles of trust law might be relevant in drawing the inference that Congress intended damages to remedy a breach."  *Navajo II*, 556 U.S. at 291.  If "the Tribe cannot identify a specific, applicable, trust creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter."  *Jicarilla*, 564 U.S. at 177 (quoting *Navajo II*, 556 at 302).

*Yakama I*, 153 Fed. Cl. 676, 695 (2021).  In *Yakama I*, the Court found NIFRMA and the statutes at issue in *Mitchell II* established a money-mandating fiduciary relationship on behalf of the government.  *Id.* at 701–03.  In *Mitchell II*, the Supreme Court indicated those statutes' clear establishment of a fiduciary duty may accordingly "fairly be interpreted as mandating compensation by the government."  *Mitchell II*, 463 U.S. at 226 ("Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained.  Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.").

In this case, the Court finds both §§ 406 and 407, as clarified by NIFRMA, establish a duty to prevent and suppress fire rooted in the same forestry obligations found to be money mandating in *Yakama I*.  *See supra* Section V.A–B; *Yakama I*, 153 Fed. Cl. at 701–03.  The government has provided no persuasive reason why, if the duties are the same, the statutes and regulations should not be fairly interpreted as money-mandating.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 480 (Ginsburg, J., concurring) ("The dispositive question, accordingly, is whether the [substantive source of law] . . . is *fairly interpreted* to mandate compensation . . . ." (emphasis added)).  The government devotes one paragraph in its Motion to Dismiss arguing plaintiffs' alleged statutes and regulations are non-money mandating.  Gov't's Renewed MTD at 21–22.  The government cites *Perri* for support, arguing "[a] statute is not money-mandating where 'it does not specify the amount to be paid or the basis for determining such amount.'"  *Id.* (quoting *Perri v. United States*, 340 F.3d 1337, 1342 (Fed. Cir. 2003)).  Even if *Mitchell II* (and *Yakama I*) had not previously established the statutes here were money-mandating, the government's argument under *Perri* would fail.  *Perri* was a confidential informant case, where the Federal Circuit distinguished "money-authorizing" statutes from "money-mandating" statutes.  *Perri*, 340 F.3d at 1341.  The Federal Circuit in *Perri* did not require a money-mandating statute to "specify the amount to be paid or the basis for determining such amount"; the court merely indicated because the statute was "not a money-mandating statute," there were no other factors supporting an inference of being "money-mandating," such as an "amount to be paid."  *See id.* at 1341–42.  In contrast, the Supreme Court indicated in *Mitchell II* §§ 406, 407, and 466 (recodified at § 5101) "clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources [and] can fairly be interpreted as mandating compensation by the Federal Government for damages sustained."  *Mitchell II*, 463 U.S. at 226 ("Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.").  The statutes in this case contemplate monetary compensation due to the trust relationship, as confirmed in *Mitchell II*, and as previously held in *Yakama I*.  *Mitchell II*, 463 U.S. at 226; *Yakama I*, 153 Fed. Cl. at 701–03.

## VII.   Whether *Navajo III* Changed the Standard for Breach of Trust with Indian Tribes

During the pendency of this case, the Supreme Court issued its decision in *Arizona v. Navajo Nation*.  *See Navajo III*, 143 S. Ct. 1804 (2023).  The parties' briefing on the government's Renewed Motion to Dismiss addressed the impact of this case on the immediate

claims.  Although the parties agree on the pre-*Navajo III* standard, they disagree on the extent to which the majority opinion in *Navajo III* modified the *Navajo II* test.  Tr. at 10:5–11:20.  The government alleges "in emphasizing the use of the word 'expressly' in *Jicarilla* . . . [the Court] tighten[ed] the . . . test a little bit.  And . . . *Navajo III* also makes it clear that the same analysis applies whether it's a statute, a treaty, or a regulation."  Tr. at 12:15–20.  According to the government, *Navajo III* is "a gloss" on *Navajo II*, re-emphasizing the mandatory duties required in the *Navajo* test.  Tr. at 12:20–21.  *Navajo III*, per the government, is not a substantial departure from *Navajo II*, but stresses "both *Jicarilla* and *Navajo III* use the word 'expressly' . . . [and] it's a significant word."  Tr. at 17:11–20.  Plaintiffs contend *Navajo III* did not change the standard at all:  "I think this . . . concept of the Supreme Court sharply focusing on express duties is really as much as we can say for *Navajo III*.  I don't think it's heightening the bar."  Tr. at 18:16–24; Tr. at 12:25–13:1 ("*Navajo III* did not change the two-part test.").  Plaintiffs allege "the [government's] position . . . that the requirement for identifying specific substantive duties . . . have to be super-specific duties . . . [is not] anywhere in *Navajo III*."  Tr. at 13:14–18.

In *Navajo III*, the Supreme Court considered whether an 1868 treaty, which "'set apart' a reservation for the 'use and occupation of the Navajo tribe,'" "imposed a duty on the United States to take affirmative steps to secure water for the Navajos."  *Navajo III*, 143 S. Ct. at 1813.  Justice Kavanaugh, writing for the Court, indicated:  "The Federal Government owes judicially enforceable duties to a tribe 'only to the extent it expressly accepts those responsibilities.'  Whether the Government has expressly accepted such obligations 'must train on specific rights-creating or duty-imposing' language in a treaty, statute, or regulation."  *Id.* (first quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173–74, 177–78 (2011); and then citing *Navajo I*, 537 U.S. at 506).  The Court concluded the Navajo treaty did not impose such an affirmative duty:  "The 1868 [Navajo] treaty . . . contained no 'rights-creating or duty-imposing language' that imposed a duty on the United States to take affirmative steps to secure water for the Tribe."  *Id.* (quoting *Navajo I*, 537 U.S. at 506).

*Navajo III* is the latest in a line of cases noting a requirement for specific, enumerated duties in trust relationships with Indian tribes.  In *Jicarilla*, the Supreme Court stated "[t]he [g]overnment assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute."  *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2325 (2023); *Navajo I*, 537 U.S. at 488 ("Although 'the undisputed existence of a general trust relationship between the United States and the Indian people' can 'reinforc[e]' the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act.  Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." (citations omitted) (quoting *Mitchell II*, 463 U.S. at 225)).  Although "the common law 'could play a role'" in imposing trust duties, the Supreme Court has stressed it is "the applicable statutes and regulations" which "establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities."  *Jicarilla*, 131 S. Ct. at 2316, 2325 (citations omitted) (first quoting *Navajo II*, 556 U.S. 287, 301 (2009); and then quoting *Mitchell II*, 463 U.S. 206, 209, 219–20, 222, 224–26 (1983)).

Despite disagreeing on the extent to which *Navajo III* heightened the requirement for statutes to be explicit in establishing the government's duties, plaintiffs contend the duties need

not be as explicit if they are derived from a "conventional trust relationship." Tr. at 20:7–18. In *Navajo III*, the Supreme Court found there was no "conventional trust relationship with respect to water." *Navajo III*, 143 S.Ct. at 1813–14. Justice Kavanaugh's opinion explained:  the government's "general trust relationship" with Indian tribes is more limited than that of a "private trustee." *Id.* The Court accordingly instructed:

> [U]nless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not 'apply common-law trust principles' to infer duties not found in the text of a treaty, statute, or regulation.

*Id.* at 1814 (quoting *Jicarilla*, 564 U.S. at 178).  The Court did not further define a "conventional trust relationship," and no previous Supreme Court case uses this exact term.  The government agreed the "negative implication" of the language is "if there is a conventional trust relationship, then a court can infer duties not found in the text." Tr. at 84:8–14.  The District Court for the District of Columbia ("DDC") likewise acknowledged this "negative implication" of *Navajo III*, rephrasing in the affirmative:  "Courts thus '"apply common-law trust principles" to infer duties not found in the text of a treaty, statute, or regulation' only if 'Congress has created a conventional trust relationship with a tribe as to a particular trust asset.'" *Hill v. U.S. Dep't of the Interior*, No. 22-1781, 2023 WL 6927266, at *13 (D.D.C. Oct. 19, 2023).  In other words, the *Navajo III* Court—quoting and consistent with the *Jicarilla* Court—indicates "common-law trust principles" are relevant if the government has a "conventional trust relationship" with the Tribe for a particular asset. *See Navajo III*, 143 S. Ct. at 1814 (quoting *Jicarilla*, 564 U.S. at 178).

Notwithstanding whether a conventional trust relationship exists here, the government contends the Supreme Court's discussion of a conventional trust relationship is merely *dicta*. Noting disagreement with the Supreme Court, the government stated at oral argument:

> [GOVERNMENT:]  I don't . . . understand the negative implication of Justice Kavanaugh's sentence in *Navajo III*.  I understand what the Court is saying.  I understand what the plaintiff[s] [are] saying about that.  I don't accept that that's true.  And it is dicta. . . .  [T]hat's inconsistent with what the Supreme Court has been at pains to teach us for . . . many years now.

Tr. at 85:15–25.  Although the government contends the statement is *dicta*, the Court must nevertheless consider the extent to which the statement is both persuasive and compatible with other binding precedent.  The government takes the position a "conventional trust relationship" with less-explicit duties does not exist with Indian tribes.  Tr. at 43:10–25 ("[GOVERNMENT:] If what [Justice Kavanaugh is] referring to is a conventional trust relationship in the sense of a trustee having comprehensive control over a designated trust asset and all aspects ensuring the benefit and welfare of that asset for the benefit of the beneficiary . . . then my answer is no.").  Plaintiffs, on the other hand, contend a conventional trust relationship could have been relevant to the government's duty to supply water in *Navajo III* if the Navajo had been able to establish a conventional trust relationship with respect to agricultural operations on tribal land:

> [THE COURT:]  To the extent the [*Navajo III*] treaty said to . . . provide tilled farm soil and agricultural equipment and support for agricultural operations in order to

sustain food, that would be a conventional trust relationship that would be broad enough to where the Court would have found . . . water can be inferred . . . and that the United States also provide water, and the majority opinion would have gone differently?

[PLAINTIFFS]:  Yes, Your Honor.

Tr. at 38:4–12.

It is not clear from *Navajo III* what actions or statutory language create a "conventional trust relationship."  Precedent, however, sheds some light on the term's meaning.  In *White Mountain Apache Tribe*, the Court provided some guidance on "when it is fair to infer a fiduciary duty qualifying under the Tucker Act and when it is not."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 466 (2003).  Specifically, the Court distinguished *Mitchell I*'s "limited" or "bare" trust from a trust "with hallmarks of a more *conventional fiduciary relationship*."  *Id.* at 473 (emphasis added).  The Court accordingly described the trust from *Mitchell I*:

> Although in form the United States "h[e]ld the land . . . in trust for the sole use and benefit of the Indian," the statute gave the United States no *functional obligations to manage timber*; on the contrary, it established that "the Indian allottee, and not a representative of the United States, is responsible for using the land," that "the allottee would occupy the land," and that "the allottee, and not the United States, was to manage the land."

*Id.* (emphasis added) (citations omitted) (first quoting 25 U.S.C. § 348; and then quoting *Mitchell I*, 445 U.S. 535, 542–43 (1980)).  The Court contrasted this "bare" trust from the *Mitchell II* trust:

> The Department of the Interior [in *Mitchell II*] possessed "*comprehensive control over the harvesting of Indian timber*" and "exercise[d] *literally daily supervision* over [its] harvesting and management," giving it a "pervasive" role in the sale of timber from Indian lands under regulations addressing "virtually every aspect of forest management."  As the statutes and regulations gave the United States "*full responsibility to manage Indian resources and land for the benefit of the Indians*," we held that they "define[d] . . . contours of the United States' fiduciary responsibilities" beyond the "bare" or minimal level, and thus could "fairly be interpreted as mandating compensation" through money damages if the Government faltered in its responsibility.

*Id.* at 474 (emphases added) (citations omitted) (quoting *Mitchell II*, 463 U.S. 206, 209, 219–20, 222, 224–26 (1983)).  Based on the Court's analysis in *White Mountain Apache*, the closest analog to *Navajo III*'s "conventional trust relationship" is accordingly what *White Mountain Apache* described as *Mitchell II*'s "conventional fiduciary relationship."  *See White Mountain Apache*, 537 U.S. at 473.  The DDC similarly acknowledged *Mitchell II*, properly interpreted, describes one example of a conventional trust relationship:

> For example, in [*Mitchell II*], the Supreme Court noted that its "construction of [certain] statutes and regulations [was] *reinforced* by the undisputed existence of a general trust relationship between the United States and the Indian people." That was because the *Mitchell [II]* plaintiffs, unlike Plaintiffs here, identified specific, statutory and regulatory provisions that established fiduciary obligations of the Government in the management and operation of Indian lands and resources in the first place.

*Hill*, 2023 WL 6927266, at *13 (citations omitted) (second and third alternations in original) (emphasis altered). With the context of *White Mountain Apache*—and the analogous inferences from *Hill*—the Court's opinion in *Navajo III* therefore indicates the treaty at issue there did not establish a "conventional trust relationship" because, unlike the regulations in *Mitchell II*, the 1868 Navajo treaty did not "[give] the United States 'full responsibility to manage Indian resources and land for the benefit of the Indians.'" *White Mountain Apache*, 537 U.S. at 474. Whereas in the *Mitchell II* treaty the government "possessed 'comprehensive control over the harvesting of Indian timber,' and 'exercise[d] literally daily supervision over [its] harvesting and management,'" *id.*, in *Navajo III*, "nothing in the 1868 treaty establish[ed] a conventional trust relationship with respect to water," *Navajo III*, 143 S. Ct. at 1814. If, however—as in *Mitchell II*—a statute, regulation, or treaty requires similar "comprehensive control" with "literally daily supervision" and "full responsibility to manage" the resource, the relationship would exhibit the "hallmarks of a more conventional fiduciary relationship," and accordingly may qualify as a "conventional trust relationship." *White Mountain Apache*, 537 U.S. at 473–74; *Navajo III*, 143 S. Ct. at 1814.

In this case, the parties disagree whether a conventional trust relationship exists. The government admits it "has trust obligations" but does not understand these obligations to stem from a "conventional trust relationship." Tr. at 40:9–13 ("[THE COURT:] [I]s there any conventional trust relationship? [GOVERNEMNT]: Not as I understand what Justice Kavanaugh is referring to here.").[4] In other words, as discussed *supra* Section V.A–B, the government acknowledges there are some duties to timber management but contends this does not establish a "conventional trust relationship." Tr. at 51:16–52:8 ("THE COURT: With respect to [§§ 406 and 407] and . . . *Yakama I*'s discussion of *Mitchell [II]*, didn't the Court . . . find that these statutes plausibly do impose duties and are money-mandating? [GOVERNMENT]: Yes, Your Honor. But not having to do with fire. . . . [THE COURT:] [I]s it not that the government has timber duties and timber responsibilities? [GOVERNMENT]: That's correct."). Plaintiffs agree "the Court cannot imply trust duties" but contends if the duties established at step one of the *Navajo* test are part of a conventional trust relationship, "the Court can imply trust duties that are within the scope of what the statute is contemplating." Tr. at 28:23–29:6. In other words, plaintiffs contend, "once a conventional trust relationship has been established, . . . [the Court] can look to implied trust duties that are within the scope of the express language." Tr. at 27:15–21.

---

[4] The government also asserted a lack of "conventional trust relationship" based on the 1855 Yakama Treaty. Tr. at 40:9–12. Plaintiffs' Second Amended Complaint removed references to the 1855 Yakama Treaty, and the Court need not consider the impact of the Treaty here. *See* Second Amended Compl.

Plaintiffs' framing of "implied trust duties" as being "within the scope of the express language" is not at odds with the Court's interpretation of "conventional trust relationship" *supra*. Although the government argues the duties must be "specific," Tr. at 41:22–24, the Supreme Court indicated in *White Mountain Apache* it is "fair to infer a fiduciary duty" when the trust bears the "hallmarks of a more conventional fiduciary relationship." *White Mountain Apache*, 537 U.S. at 473. In alignment with *White Mountain*, the Supreme Court likewise noted in *Navajo III* a court may infer duties when a "conventional trust relationship" exists. *See Navajo III*, 143 S. Ct. at 1814 ("[U]nless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not 'apply common-law trust principles' to infer duties not found in the text of a treaty, statute, or regulation." (quoting *Jicarilla*, 564 U.S. at 178)). To determine the extent to which duties may be inferred from a "conventional trust relationship," the Court asked the government a hypothetical scenario at oral argument: if the government had significant historical and immediate obligations to provide educational benefits to an Indian Tribe, would it also be required to ensure the efficacy of these educational benefits as a conventional trust relationship? *See* Tr. at 44:12–45:19. Despite the government's extensive trust commitments in education, the government denied it would be required to ensure the efficacy of such education:

> [THE COURT:] [W]ould you say that to the extent the Navajo were complaining about something related to schools, that the Supreme Court would have come out the same way and said 'Well, there's all these requirements in the treaty about teachers and buildings and things like that, but it's not a conventional trust relationship, so the government does not actually have to have windows in the schools, or something else that's school related?' . . .

> [GOVERNMENT:] I think that analysis would be valid, Your Honor. Yes, I do. Absolutely. . . . [But] [d]oes the government have a trust responsibility to make sure the teachers are good teachers?
> . . . .
> I will say that a treaty that provides, for example, that [the government] will supply teachers and will build a school doesn't create comprehensive trust responsibilities.

Tr. at 44:1–45:19. The government's position highlights the untenability of its argument here and the rationale behind the inferred duties permissible within *Navajo III*'s "conventional trust relationship." If the government commits teachers and buildings for educational pursuits, yet those educational pursuits are not met, the trust obligations are violated. Notably, the conventional trust relationship for forest management alleged here is unlike the water obligations found *not* to be a conventional trust relationship in *Navajo III*. *Navajo III*, 143 S. Ct. at 1814. There, the treaty's "set[ting] apart" a reservation for the "use and occupation of the Navajo Tribe" and to provide "seeds and agricultural implements for up to three years" failed to establish a "conventional trust relationship" for water. *Id.* at 1814–15. Based on the facts in *Navajo III*, it was clear there was at least no "full responsibility to manage" the resource, and the relationship did not seem to bear the "hallmarks of a more conventional fiduciary relationship." *White Mountain Apache*, 537 U.S. at 473–74. In this case, however, the government does have extensive responsibilities to manage the Yakama Forest for the benefit of the Yakama Nation, and the statutory and regulatory provisions cited "directly support[] the existence of a fiduciary

relationship." *Mitchell II*, 463 U.S. at 224; *see supra* Section V (discussing the language of 25 U.S.C §§ 406, 407, 5101, and corresponding regulations). In combination, these elements present the hallmarks of a conventional fiduciary relationship and a conventional trust relationship with the duty to prevent and suppress wildfires in the Yakama Forest. *See supra*; *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353, 1368–69 (Fed. Cir. 2024) ("By identifying a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property, the 1906 Act bears the 'hallmarks of a more conventional fiduciary relationship.' Thus, like the statute at issue in *White Mountain Apache*, the 1906 Act 'goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee' to protect and preserve the property." (first quoting *White Mountain Apache*, 537 U.S. at 473; and then quoting *id.* at 474–75)); *see also supra* Section V (discussing the statutory duties and historical background of the government's trust duties with respect to tribal forestland); Compl. ¶ 21 ("The United States has historically exercised, and continues to exercise, comprehensive statutory and regulatory control over management of the Nation's Forest resources held in trust . . . ."); *Ute Indian Tribe*, 99 F.4th at 1368 n.6 ("The Tribe's complaint alleged that the [government] . . . exercises 'pervasive and comprehensive control of the [water infrastructure]' . . . . The [government] did not challenge any of the factual allegations relating to the trial court's jurisdiction. At this stage of the proceedings, we must take the well-pled factual allegations of the operative complaint as true." (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (1988))); *Navajo Nation v. United States*, No. 21-1746, slip op. at 19–20 (Fed. Cl. Apr. 30, 2024) (finding a compensable fiduciary duty under *White Mountain Apache* and *Ute Indian Tribe* despite a statutory provision being "written in the permissive rather than the imperative" because the statute "contain[ed] all the 'hallmarks of a more conventional fiduciary relationship' . . . [which] are 'a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property'" (first quoting *White Mountain Apache*, 537 U.S. at 473; and then quoting *Ute Indian Tribe*, 99 F.4th at 1368)). The Court accordingly finds plaintiffs have plausibly alleged a breach of duty which falls within a conventional trust relationship for the Yakama Forest.[5] *See Navajo III*, 143 S. Ct. at 1814; *White Mountain Apache*, 537 U.S. at 473–74; *Yakama I*, 153 Fed. Cl. at 701–03; *supra* Section V.B.

---

[5] During pendency of this case, the Federal Circuit issued an opinion in *Ute Indian Tribe* which likewise relied heavily on *White Mountain Apache* to address a breach of trust claim. *Ute Indian Tribe of the Unitah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353 (Fed. Cir. 2024). There, the Federal Circuit addressed three alleged duties: (1) a duty to "secure new water for the Tribe, including by constructing new water storage infrastructure," *id.* at 1365; (2) a duty to "manage[] particular infrastructure . . . held in trust for the Tribe's benefit," *id.* at 1366; and (3) a "general obligation to protect and preserve water rights," *id.* at 1370. As to the first alleged duty, the majority found the relevant statute "neither expressly nor implicitly impose[d] such duties [to secure new water] on the United States" because it did not "create[e] a trust duty with respect to particular property." *Id.* at 1366 (first citing Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 941; and then citing *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1813 (2023)). For the second alleged duty, the panel found the relevant statute *did* impose a duty to manage water infrastructure under *Mitchell II* and *White Mountain Apache*:

> The United States' position here—that the 1906 Act establishes only a bare trust with respect to water infrastructure—is inconsistent with both the text of the 1906 statute and the Supreme Court's decision in *White Mountain Apache*. The statute here expressly describes particular property—the UIIP irrigation system—and there is express fiduciary language with an identified beneficiary—the property is to be held "in trust for the Indians." 34 Stat. 375. Moreover, the "held and operated" language prescribes specific duties. *Id.* By identifying a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property, the 1906 Act bears the

Lastly, the government contends, even if there were a conventional trust relationship, the duties would not extend to wildfire prevention and suppression. Instead, the government alleges the duties would stop at timber harvesting. Tr. at 59:3–60:2. As the government described at oral argument:

> [THE COURT:] So with a conventional trust relationship with respect to timber management and an annual sustained yield, what are the types of things that are included?
>
> [GOVERNMENT]: I think defining the scope of a cut so as not to overharvest.
>
> THE COURT: [So only] [w]hat percentage of the timber is cut?
>
> [GOVERNMENT]: Yeah. And what types of trees to cut, what ages to cut, that sort of thing. I think that's usually, if you'll forgive the expression, grist for the mill for a silviculturist who's trying to exploit the financial value of a forest, maintain it going forward, that sort of thing. . . . I think that's the essence of sustained yield. I think that's what . . . is talked about in the context of sustained yield, is not overcutting.

---

"hallmarks of a more conventional fiduciary relationship." *White Mountain Apache*, 537 U.S. at 473. Thus, like the statute at issue in *White Mountain Apache*, the 1906 Act "goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee" to protect and preserve the property. *Id.* at 474–75.

The 1906 Act, by its plain text, establishes that the United States accepted a duty to "h[o]ld and operate[]" the described irrigation systems "in trust for the Indians." 34 Stat. 375. The 1906 Act also pled a breach of this duty, namely that the United States has allowed the 1906 Act infrastructure to fall into "a grave state of disrepair." Complaint at 24. These allegations are sufficient to clear the first step of the jurisdictional analysis in *Navajo I* with respect to the failure to maintain water infrastructure. The Tribe has identified "a substantive source of law that establishes specific fiduciary or other duties," and that the complaint sufficiently "allege[d] that the Government has failed faithfully to perform those duties," as required for Indian Tucker Act jurisdiction. *Navajo I*, 537 U.S. at 506.

*Id.* at 1368. The Federal Circuit accordingly found the statute's language requiring the government to "h[o]ld and operate[]" the water infrastructure "in trust" for the Tribe to establish a duty to "protect and preserve the water infrastructure." *Id.* Based on the same *White Mountain Apache* language discussed in this Section *supra*, the panel determined the statute established more than a "bare trust" and "[b]y identifying a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property, the [statute] bears the 'hallmarks of a more conventional fiduciary relationship.'" *Id.* (quoting *White Mountain Apache*, 537 U.S. at 473). For the third alleged duty, the panel noted the statute was "less than clear" and remanded for further consideration by the lower court. *Id.* at 1370. The panel's opinion aligns with the Court's analysis here to the extent the statutory language supporting the second alleged duty identified a corpus, trustee, beneficiary, and intent to create a trust relationship. *Id.* Here, NIFRMA, in combination with §§ 406, 407, and 5101, similarly identifies each of these trust elements and accordingly establishes a trust duty to prevent and suppress wildfires under *White Mountain Apache* and *Ute Indian*. *See id.* at 1365–68. Notably, this court found similarly in *Colville*, in which Judge Meyers noted: "NIFRMA clearly recognizes the Federal Government's trust relationship to Indian Forestlands"; "Similarly, in 25 U.S.C. § 406, Congress recognizes the trust relationship and the corpus . . . ."; "Section 406 further confirms the trust relationship and the beneficiaries . . . ."; "Section 407 similarly recognizes this trust relationship." *Confederated Tribes of the Colville Rsrv. v. United States*, No. 21-1664, slip op. at 6 (Fed. Cl. May 30, 2024).

*Id.*  The government's framing of a conventional trust relationship, however, does not consider the "common-law trust principles," and "infer[ence] of duties" relevant to the unique circumstances of a "conventional trust relationship."  *See Navajo III*, 143 S. Ct. at 1814; *Jicarilla*, 564 U.S. at 178.  As Judge Wheeler indicated in *Blackfeet*:

> When the statutory structure creates such a *comprehensive set of responsibilities*, the duties Plaintiff ascribes to the Government in its complaint are either explicitly stated or can be fairly inferred from the language of the statutes.  There is no basis to the Government's contention that every detail of the duties owed to the Tribe must be expressly stated in the statutes.

*Blackfeet Tribe of the Blackfeet Indian Rsrv v. United States*, No. 12-429, slip op. at 3 (Fed. Cl. Aug. 21, 2015) (emphasis added).  Where there is a "conventional trust relationship" and a "comprehensive set of responsibilities" with respect to Indian forestland, duties inferred from specific statutory provisions can provide money-mandating obligations on the government. *Navajo III*, 143 S. Ct. at 1814 ("[U]nless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not 'apply common-law trust principles' to infer duties not found in the text of a treaty, statute, or regulation.'" (citing *Jicarilla*, 564 U.S. at 178)).  *Contra* Tr. at 22:19–23:10 ("[GOVERNMENT:]  [*Blackfeet*], I think, is wrong.  And I think that . . . is demonstrated in *Navajo III* and *Jicarilla*, that you can't imply obligations.  I think that's . . . the crux of the Supreme Court's decisions in *Navajo II*, *Navajo III*, and *Jicarilla*.  You can't imply obligations.  They have . . . to be expressly stated and specifically stated."); *but cf.* Tr. at 84:8–14 ("THE COURT:  Specifically, you agree that the dicta says, if there is a conventional trust relationship, then a court can infer duties not found in the text[?] [GOVERNMENT]:  That's the negative implication of what [the Supreme Court] is saying.  That's the negative implication of the sentence in [*Navajo III*].  Yes, sir.").  *Navajo III* accordingly permits the inference of duties with respect to a "particular trust asset" if there exists a "conventional trust relationship."  *Navajo III*, 144 S. Ct. at 1814.  Although the Court does not determine whether the Yakama Forest itself is a trust asset within this definition, *see supra*, the Court's determination §§ 406, 407, 5101, as clarified by NIFRMA, mandate a duty to wildfire prevention and suppression further reinforces the existence of a conventional trust relationship within Indian forestland in general, plausibly encompassing the Yakama Forest.  Notably, the extent of the specific duties required with respect to wildfire prevention and suppression within this "conventional trust relationship"—and the question of whether the government has breached these obligations—is a question of fact not necessary for the Court to decide at this stage.  *See Cheyenne River Sioux*, 168 Fed. Cl. at 477.  Instead, the Court finds where there is a "conventional trust relationship," as plaintiffs plausibly plead in this case, there necessarily exists money-mandating duties to prevent and suppress wildfires.  *See supra* Section V–VII; *Mitchell II*, 463 U.S. at 226; *Yakama I*, 153 Fed. Cl. at 701–03; *White Mountain Apache*, 537 U.S. at 480 (Ginsburg, J., concurring); *Cheyenne River Sioux*, 168 Fed. Cl. 465, 475 (2023) ("Unlike the Navajo Nation treaty's silence on the issue of water rights, here the Treaty expressly includes 'rights-creating or duty-imposing' language that directly addresses the status of the building." (quoting *Navajo III*, 144 S. Ct. at 1815)).

VIII.   **Whether Plaintiffs Plausibly Allege the Government Breached Its Trust Duties with the Yakama Tribe**

In summary, the Court finds plaintiffs have alleged a specific, money-mandating duty in NIFRMA, its implementing regulations, and the statutes at issue in *Mitchell II*. *See supra* Sections V.  These duties are also money-mandating for analogous reasons as in *Mitchell II* and *Yakama I*. *See supra* Section V; *Mitchell II*, 463 U.S. at 226; *Yakama I*, 153 Fed. Cl. at 701–03; *Confederated Tribes of the Colville Rsrv. v. United States*, No. 21-1664, slip op. at 27–28 (Fed. Cl. May 30, 2024).  To the extent *Navajo III* affected the *Navajo* test at all, the case further supports the Court's finding, as the Yakama Forest falls within what the Supreme Court described as "conventional trust relationship," permitting the Court to consider "common-law trust principles" to determine the duties inherent in the specific forest management duties stemming from NIFRMA and the statutes at issue in *Mitchell II*, including § 406 and § 407.  *See supra* Section VII; *Navajo III*, 143 S. Ct. at 1814.  The Court accordingly finds plaintiffs have plausibly alleged a breach of trust and denies the government's motion to dismiss plaintiffs' breach of trust claim.  *See supra* Sections V–VII.

IX.   **Whether Plaintiffs Plausibly Allege the Government's Actions and Inactions Resulted in a Taking of the Yakama Forest**

The government argues plaintiffs fail to plausibly state a takings claim because the government's alleged actions and inactions are insufficient to meet the standard for an inverse condemnation claim.  Gov't's Renewed MTD at 10.  The government contends plaintiffs' claim fails because "in order to prevail on an inverse condemnation claim, a plaintiff must prove, *inter alia*, that there was 'an intent on the part of the defendant to take plaintiff's property or an intention to do an act the natural consequence of which was to take its property.'"  *Id.* at 14 (quoting *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (1955)).  Plaintiffs argue they must show "the burning of [the] forest lands by the Cougar Creek Fire across more acres and at a higher severity was the 'likely, foreseeable result' of the United States' action and inaction."  Pls.' Resp. at 35–36 (quoting *Cary v. United States*, 552 F.3d 1373, 1377 (Fed. Cir. 2009)).  The parties agree the appropriate test in this instance is the two-part *Ridge Line* test.  Gov't's Renewed MTD at 10; Pls.' Resp. at 35  *Ridge Line* defines the first prong, "causation," as requiring:

> First . . . the government [must] intend[] to invade a protected property interest or the asserted invasion [must be] the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action."

*Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (quoting *Columbia Basin Orchard*, 132 F. Supp. at 709).  The second prong, "appropriation," requires:

> Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for

an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1356.  This test tracks a takings analysis for an "inverse condemnation."  *Cary*, 552 F.3d at 1377–80.  An inverse condemnation occurs when "the government conducted no formal exercise of eminent domain."  *Id.* at 1376 (citing *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005)).  In order to plausibly allege a taking under the *Ridge Line* standard, plaintiffs' claims must satisfy both prongs of the test.  *Ridge Line*, 346 F.3d at 1355–56.

### A.    *Ridge Line* Prong 1:  Whether Plaintiffs Plausibly Allege the Government's Actions and Omissions Caused an Invasion of the Tribe's Property Interest

Turning to the first prong of the *Ridge Line* test, the parties disagree whether the government's actions in the Yakama Forest were "intended to invade a protected property interest" or were the "direct, natural, or probable result" of the government's actions.  Gov't's Renewed MTD at 14–15; Pls.' Resp. at 35–41.  The parties agree the most recent controlling opinion on causation is *Cary v. United States*, 552 F.3d 1373 (Fed. Cir. 2009).  Tr. at 112:24–113:1; 113:9–12.  In *Cary*, landowners in the Cleveland National Forest sued the government after a lost hunter's signal fire spread and destroyed their land.  *Cary*, 552 F.3d at 1375.  The plaintiffs in *Cary*, similar to the present case, alleged the Forest Service took a "known calculated risk that its land management policies in the [forest] would result in a taking of the landowners' property in the event of a fire."  *Cary*, 552 F.3d at 1375.  Assessing the plaintiffs' complaint under the *Ridge Line* standard, the Federal Circuit determined the plaintiffs failed to prove causation because they "[did] not plead[] that the loss of property would be the likely, foreseeable result of a policy of fire suppression and recreational use, but merely that the government knew of or increased a risk."  *Id.* at 1378.  The Federal Circuit indicated "*Moden* clarified the meaning of 'direct, natural, or probable result' to mean that the injury must be the likely result of the act, not that the act was the likely cause of the injury, the latter allowing for incidental injuries resulting from a true cause-in-fact to be considered a taking."  *Id.* at 1377 (citing *Moden*, 404 F.3d at 1343).

In considering whether the hunter's signal fire was an intervening cause, the *Cary* court provided a hypothetical illustration, explaining:

[The] government may [not] escape liability *per se* by finding an incidental intervening or contributing cause between their authorized action and the alleged injury.  Wherever there is an authorized action, the causation prong is satisfied for any injury which is the direct, natural, and probable result of that action. For instance, had the government action been to accumulate fuel loads in the [Cleveland National Forest], even without knowledge that such fuel loads would become a large conflagration upon any ignition, then any ignition, even one negligently started by unauthorized human hands, would be adequate for that government act to satisfy the causation prong.  This is because an ignition is the direct, natural and probable result of the government intentionally allowing fuel loads to accumulate in a fire zone, and a conflagration is the direct, natural, and probable result of this ignition in a forest with high fuel loads. . . .  Only by an intervening cause was the

authorized action converted into a damaging event.  The landowners would be correct that the government did not need to light the match to be liable, but to be a taking, it must have at least authorized supplying the fuel.

*Id.* at 1379 (the "*Cary* hypothetical").  The Federal Circuit accordingly indicated if the government permitted "accumulat[ion of] fuel loads" in a forest, this would satisfy the chain of causation.  *Id.* ("[A]n ignition is the direct, natural and probable result of the government intentionally allowing fuel loads to accumulate in a fire zone, and a conflagration is the direct, natural, and probable result of this ignition in a forest with high fuel loads.").  Unlike the *Cary* hypothetical *supra*, the Federal Circuit determined "[t]he only relevant direct, natural, or probable result of the Forest Service policies pleaded by the landowners was a heightened risk, not a wildfire that would spread to neighboring properties" and described the hunter's fire as a "hole in the causal chain."  *Id.* at 1378.  The Federal Circuit accordingly indicated a heightened risk alone cannot establish causation, in contrast to a "direct, natural or probable result" of governmental action.  *Id.*

Plaintiffs here contend they have pled a plausible takings claim because the government has performed affirmative actions for which burning of forest lands was the "likely foreseeable result."  Pls.' Resp. at 35–36.  When asked at oral argument to describe the government's affirmative actions alleged in their Complaint, plaintiffs identified three:  (1) entering into timber sales resulting in slash piles building up across the forest for decades; (2) failing to carry out forest management duties; and (3) withdrawing "hundreds of firefighters . . . off of this fire so that they could fight fires elsewhere in the region."  Tr. 124:7–125:23.  Each of these, plaintiffs allege, are affirmative actions which "resulted in the injury that [plaintiffs] sustained."  Tr. at 125:21–23.  The Court accordingly assesses whether, assuming these three allegations are true, a wildfire is the "direct, natural, or probable result" of the government's actions as in the *Cary* hypothetical or whether the actions merely created a "heightened risk" of conflagration akin to the *Cary* facts.  *See Cary*, 552 F.3d at 1378.

### 1. Whether the Alleged Buildup of Slash Piles Satisfies the *Cary* Causation Prong

Plaintiffs allege "[t]he facts here are analogous to the *Cary* Court's hypothetical [because the government] . . . failed to . . . remove timber slash piles, thereby directly supplying the fuel for the Cougar Creek Fire."  Pls.' Resp. at 38.  At oral argument, the government described the *Cary* hypothetical as "very confusing," finding it hard to square with the case's holding, where the court found an "increased risk" of fire was insufficient to establish causation alone.  Tr. at 119:1–12.  The only way the government distinguishes *Cary*'s hypothetical from its holding is by arguing the opinion requires the government action to be "intentional[]."  *Cary*, 552 F.3d at 1379 (explaining "ignition is the direct, natural and probable result of the government intentionally allowing fuel loads to accumulate in a fire zone").  The government contends plaintiffs are alleging actions which were not "intentional[]" but instead "sloppy."  Tr. 122:13–17 ("[GOVERNMENT:]  But, again, the language that I think explains the  hypothetical is the language 'intentionally allowing fuel loads to accumulate.' . . .  [T]he  allegation in our case is not that the government intentionally did that.  The allegation is that we were sloppy.").  In focusing exclusively on the word "intentionally," however, the government reads out an earlier

line in the hypothetical:  "[H]ad the government action been to accumulate fuel loads . . ., *even without knowledge* that such fuel loads would become a large conflagration . . . [this] would be adequate for that government act to satisfy the causation prong."  *Cary*, 552 F.3d at 1379 (emphasis added).  If the government can accumulate fuel loads "without knowledge that such fuel loads would become a large conflagration," this indicates the government only need to "inten[d]" to perform the action itself (i.e., accumulating fuel loads), not intend the result of conflagration.  *Id.*  Even if plaintiffs were arguing the government was "[being] sloppy," they are still alleging the fuel loads occurred purely through governmental action—i.e., the government still had an intent to perform alleged actions which directly resulted in accumulation of fuel loads.  Plaintiffs' Second Amended Complaint alleges the government "failed to adequately address the substantial fire hazard . . . [and] dispose of slash piles from past timber sales."  Second Am. Compl. ¶ 15.  This allegation is parallel to the *Cary* hypothetical of "accumulate[d] fuel loads" and is accordingly sufficient to meet the facts of the *Cary* hypothetical and establish causation.  *See Cary*, 552 F.3d at 1379.

Although the Court generally agrees there is tension between *Cary*'s hypothetical and its holding, the Federal Circuit's hypothetical indicates some anticipated outer boundary where authorized government action can have a direct, natural, and probable consequence without explicit intent to cause the probable injury.  *See id.* ("This is not to say that the government may escape liability *per se* by finding an incidental intervening or contributing cause between their authorized action and the alleged injury.").  As *Cary* establishes in its hypothetical, allowing fuel loads to accumulate, even without knowledge the fuel loads would necessarily catch fire, is within the boundary of causation.  *Id.*  Based on the hypothetical, the Court accordingly finds plaintiffs have plausibly alleged a conflagration was the "direct, natural, and probable result" of the "accumulation of fuel loads"—the growth of the slash piles—despite the potentially intervening cause of a lightning strike.  *See id.* ("[H]ad the government action been to accumulate fuel loads in the [Cleveland National Forest], even without knowledge that such fuel loads would become a large conflagration upon any ignition, then any ignition, even one negligently started by unauthorized human hands, would be adequate for that government act to satisfy the causation prong."); Tr. 122:3–17 ("[THE COURT:]  [*Cary* says,] 'had the government action been to accumulate fuel loads . . . even without knowledge that such fuel loads would become a large conflagration upon any ignition . . . .'  Is that not slash piles? [GOVERNMENT]:  It is slash piles, Your Honor.").  Notably, the Court does not reach a conclusion on whether governmental action did, in fact, result in slash pile buildup nor the extent to which those slash piles caused or exacerbated the fire damages.  *Cf., e.g.,* Tr. at 122:18–22 ("[GOVERNMENT:]  [W]ere we to get to a trial on this case, it would be interesting to find out who actually was responsible for cleaning up the slash, because it's not the federal government. But that's . . . a whole different kettle of fish.").  The Court's finding is only plaintiffs have alleged, in conformance with *Cary*, a plausible authorized government action of which fire is

"the direct, natural, or probable result . . . and not the incidental or consequential injury."[6, 7] *Cary*, 552 F.3d at 1377 (quoting *Ridge Line*, 356 F.3d at 1355).

### 2. Whether the Allegations of General Forest Mismanagement and Reallocation of Firefighting Resources Satisfy the *Cary* Causation Prong

The Court next turns to plaintiffs' allegations the government's general forest mismanagement and its reallocation of firefighting resources both caused a taking. Plaintiffs allege "[t]he United States failed to properly maintain the Yakama Forest," Pls.' Resp. at 38, and the government's "actions and omissions . . . accomplished an unconstitutional taking." Second Am. Compl. ¶ 23–25. The government contends plaintiffs' alleged actions are omissions, rather than affirmative actions, and are therefore not compensable. Gov't's Renewed MTD at 16–17. The government cites the Federal Circuit case *St. Bernard*, contending "only deliberate—as opposed to negligent—acts can give rise to a taking."[8] Gov't's Renewed MTD at 16 (citing *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1354 (Fed. Cir. 2018)). In *St. Bernard*, the Federal Circuit reversed the Court of Federal Claims' finding a taking occurred during Hurricane Katrina when the government's "failure to properly maintain or modify [a dam]

---

[6] In *Cary*, the Federal Circuit noted "[f]oreseeability and causation are separate elements that must both be shown (when intent is not alleged)." *Cary v. United States*, 552 F.3d 1373, 1379 (Fed. Cir. 2009) (citing *Moden v. United States*, 404 F.3d 1335, 1343 (Fed. Cir. 2005)). The court noted "destruction of property [being] foreseeable" must be accepted at the motion to dismiss stage. *Id.* at 1380. At oral argument, the government agreed with the Court the foreseeability of damages here must be accepted as true to the extent "those allegations are plausible." Tr. at 130:1–6. Based on the *Cary* hypothetical, plaintiffs plausibly allege conflagration was the "direct, natural, or probable result" of the government's authorized actions resulting in a buildup of slash piles, and the fire was "the likely result of the act." *Cary*, 552 F.3d at 1377 (citing *Moden* 404 F.3d at 1343)).

[7] The government also cites *Teegarden v. United States*, 42 Fed. Cl. 252 (1998), as instructing the failure to suppress wildfires cannot give rise to a takings claim. Gov't's Renewed MTD at 17–18. In *Teegarden*, a large wildfire broke out in Utah, prompting the government to assemble a team to suppress the fire. *Teegarden*, 42 Fed. Cl. at 253. The plaintiffs there alleged the government "deliberately and intentionally concentrated fire suppression manpower" on areas other than the plaintiffs' land. *Id.* at 256. The Court of Federal Claims granted the government's Motion for Summary Judgment, finding the government's decision to focus on areas other than plaintiffs' property did not amount to a taking because there was no intent to take the property. *Id.* ("Although little doubt exists that the execution of the fire suppression plan according to established priorities was an exercise of proper authority by government officials, plaintiffs have not identified any decision or action by the Forest Service indicating an intent to take plaintiff's property"). The court also found a failure to prove causation because "the Uinta Flat Fire, not the Forest Service, caused the destruction of plaintiffs' property." *Id.* at 257. As the government acknowledged at oral argument, however, this Court of Federal Claims case was decided before *Ridge Line* and accordingly before the Federal Circuit's *Cary* hypothetical. Tr. at 169:9–13 ("Now, *Teegarden* is pre *Ridge Line* . . . [b]ut I think that the . . . logic is sound . . . ."). To the extent the government relies on *Teegarden* as an example of the need for intentionality or to allege the lightning strike here was an intervening cause, the Court finds plaintiffs plausibly allege intentionality and causation based on the *Cary* hypothetical: i.e., the government had the alleged intent to accumulate slash piles, of which conflagration was the direct, natural, and probable consequence. *See supra*; *Cary*, 552 F.3d at 1379 ("[T]he government did not need to light the match to be liable, but to be a taking, it must have at least authorized supplying the fuel.").

[8] The government cites *St. Bernard* in its *Ridge Line* Prong 2 arguments. Gov't's Renewed MTD at 16–19 ("An important component of the appropriation for a public purpose requirement is that only deliberate—as opposed to negligent—acts are covered."). *St. Bernard*, however, was a causation case. *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1368 (Fed. Cir. 2018) ("Thus, there was a failure of proof on the key issue of causation."); *see also Johnson v. United States*, No. 22-584, 2023 WL1428603, at *8 (Fed. Cl. Jan. 31, 2023) (treating affirmative governmental action under *St. Bernard* as a precondition to causation).

constituted a taking by causing flooding damage to [the plaintiffs'] properties." *St. Bernard*, 887 F.3d at 1358. The Federal Circuit separated the allegations of governmental inaction from those of affirmative action. *Id.* at 1360. As for inaction, the court indicated, "[w]hile the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim. . . . On a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government." *Id.* This court recently addressed government inaction in the fire-suppression context in *Johnson*, a case argued by *pro se* plaintiffs and addressed substantively by Judge Solomson. *Johnson v. United States*, No. 22-584, 2023 WL 1428603 (Fed. Cl. Jan. 31, 2023). There, the court indicated "[t]o the extent that Plaintiffs reference tactical burns as part of their overall critique of the government's fire control strategy, the government's failure to engage in alternative or additional fire control measures does not amount to an affirmative act sufficient to satisfy *St. Bernard*." *Id.* at *8. Judge Solomson accordingly found no takings liability for a shift in firefighting resources. *See id.*

Plaintiffs here contend their case is distinguishable from *St. Bernard* and *Johnson* because the government in those cases was not under a duty to act.[9] Pls.' Resp. at 41. Tr. at 126:10–25 ("[PLAINTIFFS:] [T]he kicker in *St. Bernard* is 'inaction absent a duty.' And that language did not carry through to the *Johnson* opinion. Because there was no duty. There was no reason in *Johnson* for the court to be looking at whether the federal government owed a duty to fire suppression on private property within that national forest. THE COURT: So the focus is different here because the government has a broad duty to look after the timber[?] [PLAINTIFFS]: Yes, Your Honor."). The line plaintiffs cite in *St. Bernard*, however, does not include any direct discussion of a "duty to act"; the Circuit was instead describing the Court of Claims' decision in *Georgia Power Co. v. United States*, 633 F.2d 554 (Ct. Cl. 1980). *See St. Bernard*, 887 F.3d at 1362 ("Finding no takings liability for failure to regulate sailboat mast heights, the Court of Claims explained [in *Georgia Power*] that 'issuance of such regulations is merely a discretionary act, and a taking may not result from this discretionary inaction' absent a duty to act." (quoting *Georgia Power*, 633 F.3d at 527)). The only time the term "duty" appears in *St. Bernard* is in reference to *Georgia Power*. In *Georgia Power*, the three-judge panel noted the lack of "affirmative duty imposed on [the government]," and the panel provided no discussion of when a breach of duty and a lack of "reasonable actions to discharge [the government's] responsibilit[ies]" can give rise to a takings claim. *See id.* at 527. The panel's holding "a taking may not result from . . . discretionary inaction," however, does not establish the inverse, i.e., a taking *must* occur from a breach of duty. *See id.*

The weight of authority indicates government inaction cannot give rise to a takings claim. *See, e.g.*, *St. Bernard*, 887 F.3d at 1362 ("Takings liability must be premised on affirmative government acts."); *Johnson*, 2023 WL 1428603, at *6 ("[P]laintiffs must allege *facts* that constitute an affirmative government act . . . ."); *see also Teegarden v. United States*, 42 Fed. Cl. 252, 257 (1998) ("In the context of a claim for inverse condemnation, damages resulting from

---

[9] Plaintiffs also cite *TrinCo Investment Co. v. United States* as an example of a case where a "federal fire-fighting agency's suppression tactics create a triable issue of fact for an inverse condemnation claim." Pls.' Resp. at 38 (citing *Trinco Inv. Co. v. United States*, 722 F.3d 1375 (Fed. Cir. 2013)). As plaintiffs acknowledged at oral argument, however, "the discussion in [*TrinCo*] is the necessity defense." Tr. at 162:9–10. Although *TrinCo* is an example of a case where the Federal Circuit reversed the Court of Federal Claims' dismissal of a wildfire takings claim, *TrinCo* does not provide any assistance in the analysis here, as the necessity defense is not at issue. *See Trinco*, 722 F.3d at 1380.

"'a random event induced more by an extraordinary natural phenomenon than by Government interference'" cannot rise to the level of a compensable taking, 'even if there is permanent damage to property partially attributable to Government activity.'" (quoting *Berenholz v. United States*, 1 Cl. Ct. 620, 626 (1982))) . Plaintiffs agree affirmative acts are typically required in inverse condemnation cases. Tr. at 163:1–2 ("[PLAINTIFFS]: I agree that inaction, absent a duty to act, cannot give rise to a taking."). Although, as discussed *supra*, actions such as leaving slash piles, may give rise to a plausible takings claim due to conflagration being a direct, natural, and probable consequence of the action, plaintiffs present no cases affirmatively supporting liability stemming from a breach of duty to act alone. Generally failing to manage the forest (e.g., "failing to act even when its own experts identified the Forest's perilous condition," Second Am. Compl. ¶ 25) and "allocat[ing] . . . federal [firefighting] resources to other federal priorities" both fall within the category of omissions the Court has found cannot rise to the level of a taking, Pls.' Resp. at 2. *St. Bernard*, 887 F.3d at 1360–62; *Johnson*, 2023 WL 1428603, at *6, *8. To the extent plaintiffs' Complaint relies on the general mismanagement of the forest or the reallocation of firefighting resources, these allegations are insufficient to support a takings claim, and the Court grants in part the government's Motion to Dismiss. *Cary*, 552 F.3d at 1377; *St. Bernard*, 887 F.3d at 1360–62; *Johnson*, 2023 WL 1428603, at *6, *8; *see also Teegarden v. United States*, 42 Fed. Cl. at 257.

### B.     *Ridge Line* Prong 2: Whether Plaintiffs Plausibly Allege the Government's Failure to Remove Slash Piles Appropriated a Benefit to the Government

Under the second prong of the *Ridge Line* test, plaintiffs must show the government's actions "appropriate[d] a benefit to the government at the expense of the property owner, or at least preempt[ed] the owner['.]s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Ridge Line*, 346 F.3d at 1356. This test is phrased in the alternative, requiring plaintiffs to satisfy either of the disjunctive inquiries: benefit to the government or preemption of the right to enjoy property for an extended period of time. *Id.*; *see also* Tr. at 153:25–154:8 ("[GOVERNMENT]: As properly construed, Your Honor, it is a twofold test. That's correct."). The government alleges plaintiffs fail to meet either burden because "the prioritization of federal funds and resources cannot constitute a taking." Gov't's Renewed MTD at 17 (citing *Teegarden*, 42 Fed. Cl. 252 ). Plaintiffs allege the first inquiry is met when the government benefitted from "not allocat[ing] funding, equipment, or staffing" to fight the Cougar Creek Fire and "re-allocat[ing] resources from" fighting the fire. Pls.' Resp. at 40. As the test is disjunctive, plaintiffs may establish a plausible takings claim by satisfying either inquiry.

The Court starts by assessing whether the government's actions were so substantial so as to "preempt [plaintiffs'] right to enjoy [their] property for an extended period time." *Ridge Line*, 346 F.3d at 1355. At oral argument, plaintiffs cited two cases as instances where a takings claim passed this inquiry, *Arkansas Game & Fish* and *Rancho de Dias Alegres*. Tr. at 163:8–13. In *Aransas Game & Fish*, the Supreme Court considered an appeal from the Federal Circuit, where the Circuit had found the government not liable under a takings theory for approving controlled flooding outside of the planned seasonal rates. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 27–28 (2012). The government had set seasonal rates for releasing water from a dam over a period of several years but deviated the rate of flow at the request of downstream farmers.

*Id.*  This change in flow rate resulted in more flooding behind the dam and affected the plaintiffs' ability to grow and harvest trees in their wildlife management area.  *Id.* at 28.  The Supreme Court held "simply and only, that government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection."  *Id.* at 38.  In reaching this decision, the Court noted "[f]looding cases, like other takings cases, should be assessed with reference to the 'particular circumstances of each case,' and not by resorting to blanket exclusionary rules." *Id.* at 37 (quoting *United States v. Central Eureka Min. Co.,* 357 U.S. 155, 168 (1958)).  In *Rancho de Dias Alegres*, Judge Dietz recently denied the government's motion to dismiss in a case involving a controlled burn which "grew out of control" and damaged the plaintiffs' ranches.  *Rancho de Dias Alegres LLC v. United States*, 168 Fed. Cl. 139, 142–43 (2023).  In discussing appropriation, the court similarly noted "discovery is necessary to determine whether plaintiffs' allegations demonstrate a taking, and, therefore, plaintiffs should be given the opportunity to develop facts in support of their claims."  *Id.* at 147 (quoting *Orr v. United States*, 145 Fed. Cl. 140, 158 (2019)).  The court concluded "Rancho has plausibly alleged that the government [action satisfies prong two of the *Ridge Line* test]."  *Id.* (citing *Ridge Line*, 346 F.3d at 1356).

At oral argument in this case, plaintiffs alleged the inquiry here, as in *Arkansas Game & Fish* and *Rancho de Dias Alegres* is a factual one:  "[I]t is a very fact-specific inquiry.  And you have to look at whether there is sufficient invasion of that property right over a period of time to satisfy that prong, which is a very facts-intensive inquiry."  Tr. at 164:6–10.  Plaintiffs point to the injury being a loss of timber, which plaintiffs contend is pervasive enough to satisfy the appropriation prong:  "[W]hen we're talking about the duration of this appropriation, the injury was the loss of timber.  The duration of that loss is going to be for many decades, for generations."  Tr. at 165:1–4; *see also* Tr. 175:2–17 ("[PLAINTIFFS]: [I]n *Cary* . . . [t]hey were talking about the difference between structures and timber.  And they were saying that if . . . your house burns down, you can rebuild your house.  You can have another house up on that property within a year.  I think here they say five years.  You can't regrow a commercially valuable-sized tree in five years.  You can't do it in 10 years.  You can't do it in 20 years.  It takes a generation in order to regrow, to regenerate the value.").  The takings inquiry here, as in the cases plaintiffs cite, is fact specific because it hinges on the disputed effect of the government's alleged actions and the effect of these alleged actions on the Cougar Creek Fire.  Plaintiffs clarified their position on the fact-specific inquiry at oral argument:

> [THE COURT:]  Is it [plaintiffs' allegation] that the Court must assume lightning will strike and that fires will start, but . . . add to that slash piles that cause [a] large fire in order to wipe out the forest and destroy the full canopy . . . ?
>
> [PLAINTIFFS]:  Yes, Your Honor.

Tr. at 117:22–118:7.  The government indicated this "might be" a fact-specific inquiry:

> [THE COURT:]  [F]or purposes of this stage, you agree that we must accept as true that the government's actions and policies accrued significant resource benefits?
> . . . .
> The pleadings indicate, I guess, less government land was burned perhaps.

[GOVERNMENT]:  Perhaps.

. . . .

[THE COURT:]   [I]f plaintiffs' pleadings indicate that more government land would have burned had the government not devoted more resources to the Yakama land, is that not enough?

[THE GOVERNMENT]:  It might be.  But that's not the allegation.  They just alleged that we should have spent all of our money protecting their forest and ignoring our forest.

Tr. at 166:10–167:19; *see also* Tr. at 219:22–220:3 ("[PLAINTIFFS]:  I think [it] is a question of fact as to the motives as to why the United States was leaving slash piles across the forest.  [GOVERNMENT]:  Or why the tribe was leaving slash piles, as the case may be.  The assumption here is that it was the United States' responsibility, and that's . . . just an allegation.").  Under the second half of the *Ridge Line* test, plaintiffs must show "the government's interference with any property rights . . . was substantial and frequent enough to rise to the level of a taking."  *Ridge Line*, 346 F.3d at 1357.  In *Cary*, the Federal Circuit indicated "many a city has rebuilt after a devastating fire, so we cannot infer from the complaint that the fire prevented the rebuilding of infrastructure that would allow the landowners to reoccupy their property."  *Cary*, 552 F.3d at 1381.  In this case, like the fire in *Rancho de Dias Alegres*, there are sufficient factual issues—such as the effect of slash piles on exacerbating the Cougar Creek Fire—which prevent the Court from reaching a decision as a matter of law on whether the government's actions were so substantial so as to "preempt [plaintiffs'] right to enjoy [their] property for an extended period time."  *See Ridge Line*, 346 F.3d at 1355; *Rancho de Dias Alegres*, 168 Fed. Cl. at 147.  Construing facts in the light most favorable to plaintiffs and making all reasonable inferences from the plaintiffs' pleadings, however, plaintiffs' Second Amended Complaint plausibly alleges the government "preempt[ed] [plaintiffs'] right to enjoy [their] property for an extended period of time, rather than merely inflict[ed] an injury that reduces its value."[10]  *Ridge Line*, 346 F.3d at 1355; *Ark. Game & Fish*, 568 U.S. at 37–38; *Rancho de Dias Alegres*, 168 Fed. Cl. at 147.  As a question of fact exists over whether the government's actions were so substantial as to "preempt [plaintiffs'] right to enjoy [their] property for an extended period time," the Court need not determine whether the allocation of firefighting resources also appropriated a benefit to the government.  *Ridge Line*, 346 F.3d at 1355.  The Court accordingly denies in part the government's Motion To Dismiss to the extent plaintiffs' claim is based on the government's actions resulting in the accumulation of slash piles in the Yakama Forest and grants in part to the extent plaintiffs' Complaint relies on the general mismanagement of the forest or the reallocation of firefighting resources.  *Ridge Line*, 346 F.3d at 1355; *Cary*, 552 F.3d at 1377; *St. Bernard*, 887 F.3d at 1360–62; *Johnson*, 2023 WL 1428603,

---

[10] At oral argument, plaintiffs raised a new argument, contending the Federal Circuit in *Moden* indicated jurisdiction is proper for any claim under the Takings Clause, so long as the claim is not "frivolous . . . [i]nsignificant, insubstantial, [or] contrary to precedent."  Tr. at 233:6–8.  As plaintiffs recognize, however, *Ridge Line* was based on "the 12(b)(6) standard."  Tr. at 233:11–12.  The Court, however, grants the government's motion to dismiss in part under RCFC 12(b)(6) pursuant to the Federal Circuit's application of the *Ridge Line* standard in *St. Bernard Parish*.  Plaintiffs' argument under RCFC 12(b)(1) is therefore inapplicable here.

at *6, *8; *Ark. Game & Fish*, 568 U.S. at 37–38; *Rancho de Dias Alegres*, 168 Fed. Cl. at 147; *see supra* Section IX.A.

## X.   Whether the Plaintiffs' Claims are Timely Under the Statute of Limitations or, Alternatively, Whether Plaintiffs Waived Their Claims

The government contends plaintiffs' claims of forest mismanagement occurring prior to June 2015 are barred by the statute of limitations.  Gov't Renewed MTD at 31–40.  To the extent any claims are not time barred, the government contends plaintiffs signed a settlement agreement waiving any claims accruing prior to 2013.  *Id.* at 41–42.

### A.   Whether Plaintiffs' Claims Arose at the Time the Cougar Creek Fire Started

The government contends most of plaintiffs' claims are barred by the statute of limitations because "[e]ight of the ten allegations that Plaintiffs advance in the Complaint are for alleged mismanagement antedating the Cougar Creek Fire."  Gov't Renewed MTD at 32.  Plaintiffs contend, even though the alleged breach of duty began as early as 2000, their claim did not accrue until the time of the Cougar Creek Fire in 2015.  Pls.' Resp at 22–23.  The government alleges "[a] cause of action accrues when all events which fix the Federal Government's alleged liability have occurred and the plaintiff was or should have been aware of their existence."  Gov't Renewed MTD at 32 (first citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); and then citing *Ingram v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009)).  As the Federal Circuit indicated in *Menominee*, "[t]he statute of limitations accrues when the plaintiff was 'capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim,'" the government accordingly alleges all claims of mismanagement prior to 30 June 2015—six years before plaintiffs filed their complaint—are time barred.  *Id.* at 32–33 (quoting *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984)).  In response, plaintiffs argue their claim "is a single claim" for breach of trust, accruing at the time of the fire on 10 August 2015, where "[t]he harm caused [by the] Cougar Creek Fire is an essential element."  Pls.' Resp. at 23–24.  According to plaintiffs, "in order for a claim to accrue, the plaintiff must have suffered damages."  *Id.* at 22 (citing *Rosebud Sioux Tribe v. United States*, 75 Fed. Cl. 15, 24 (2007)).  Without these damages, plaintiffs contend their "alleged claim would not be 'ripe,' because it would rest on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  At this stage of the case, before a full record has developed, the Court need not decide whether plaintiffs' claim accrued in 2015 if the claim is potentially continuing.  *See Rosebud Sioux Tribe*, 75 Fed. Cl. at 25 ("It cannot be said at this early stage of the litigation that the Complaint does not, or could not, encompass claims that are not barred by the statute of limitations."); *see also Confederated Tribes of the Colville Rsrv. v. United States*, No. 21-1664, slip op. at 33 (Fed. Cl. May 30, 2024) ("Nor is there enough in the record at this point to conclude that the Plaintiff was so involved in the management of the forest that it knew of the Government's prior breaches alleged in this case.").  The Court accordingly assesses whether plaintiffs' breach of trust claim falls within the continuing claim doctrine.

The government argues the claims here do not meet the standard for the continuing claims doctrine, contending plaintiffs' claims are not "'inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages,' [where] at least one of these events falls within the limitations period." Gov't's Reply at 17 (quoting *Rosales v. United States*, 89 Fed. Cl. 565, 579 (2009) (quoting *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)). Plaintiffs disagree, stating the "continuing claim doctrine has been uniquely applied in the tribal forestry context to preserve tribal claims that are based in the United States' statutorily-prescribed continuing duties," particularly in the case of *Mitchell v. United States* (*Mitchell IV*). Pls.' Resp. at 25 (citing *Mitchell IV*, 10 Cl. Ct. 787, *modifying* 10 Cl. Ct. 63 (1986)). In 1997, the Federal Circuit decided *Brown Park* and outlined factual situations where the continuing claims doctrine may apply, distinguishing its facts from those in *Mitchell IV*. In *Brown Park*, "plaintiffs claimed that the Secretary of the Interior, acting through the [BIA], had failed to properly discharge his duties under federal statutes that assigned to him various responsibilities with respect to the timber . . . [and] [t]he government moved to dismiss for lack of timeliness . . . [for] events occurring more than six years prior to the commencement of the suit." *Brown Park*, 127 F.3d at 1458 (citing *Mitchell*, 10 Cl. Ct. at 65). The Federal Circuit contrasted *Mitchell IV*, which "involved individual actionable wrongs . . . [with] distinct breaches of statutory duties." *Id.* at 1459. In *Mitchell IV*, the court explained, "the existence of a continuing duty to regenerate mean[t] that on each day the BIA failed in its duty to regenerate a given [area], there arose a new cause of action." *Id.* at 1458 (alterations in original) (quoting *Mitchell IV*, 10 Cl. Ct. at 788). In contrast, the *Brown Park* plaintiffs brought Section 8 claims alleging the government had "failed to make the proper rent adjustments." *Id.* at 1453. These claims were not continuing in nature, the court found, because they were "not a case of recurring, individual actionable wrongs." *Id.* at 1459. The Federal Circuit therefore indicated a claim involving "recurring, individual actionable wrongs," similar to the claims in *Mitchell IV*, may be within the jurisdiction of this court despite beginning outside the six-year statute of limitations. *Id.* at 1459.

Under the continuing claims doctrine, to "sue with respect to" alleged breaches of duty from "long ago" (i.e., outside the Court's six-year statute of limitations), plaintiffs must plausibly allege the government has committed "individual actionable wrongs" constituting breaches of a "continuing duty." *Id.* (citing *Mitchell*, 10 Cl. Ct. at 65); *Mitchell IV*, 10 Cl. Ct. 789. Plaintiffs allege the damages here have occurred daily since the breach of trust began because "every day that the [government does not] . . . prepare to suppress wildfires, every day that they are not managing for fuel[] . . . in the Yakama forest . . . the Yakama Nation is accruing a new claim for damages." Tr. at 190:10–23 ("[PLAINTIFFS]: The failure of trust duties is continuing in nature. So we have the settlement that the United States points to in June of 2013. And the day after that settlement was entered as an order of the court, there was a claim for breach of trust for the United States because they had not taken actions to manage wildfire risk on the forest. They had not taken actions to prepare to suppress wildfires that occur within the forest. . . ."). At oral argument, the government agreed plaintiffs must have suffered damages in order for their breach of trust claim to accrue but disputed the timeline of when damages began. Tr. at 201:22–202:8 ("[THE COURT:]  [Y]ou agree that claims accrue when damages have occurred, correct? [GOVERNMENT]:  Well, when all of the elements of a claim have occurred or are known or reasonably knowable to the plaintiff[s]. THE COURT:  But the claim must include damages. [GOVERNMENT]:  Yes. . . . And plaintiffs have just conceded that when the slash pile was left

there in 2005, there was damage."). Notably, in *Mitchell IV*, the Claims Court found "[the] duty to replant . . . [was] an ever-present one, rather than one tied to a fixed point in time." *Mitchell IV*, 10 Cl. Ct. at 789. The duty to replant was accordingly not a one-time obligation, but instead a duty the government was required to continually perform to fulfil its obligations within the forest. *See id.* In this case, the government's repeated efforts to address fire hazards in the Yakama Forest indicate its fire prevention and suppression duties, as clarified by NIFRMA, are ongoing like those in *Mitchell IV*. *See supra* Sections V–VI. In 2005, for example, the BIA issued a "Forest Management Plan," which acknowledged an increased risk of fire in the Yakama Forest and the need for management to address the hazard. Gov't's MTD Ex. A at 8, 33, ECF No. 41-1 (describing the "Yakama Reservation Fire Plan" which "specifies the manpower and equipment needs for each national fire danger rating class."). The government produced similar reports in 2013 and 2014. Gov't's MTD Ex. G at 22–24, ECF No. 41-7 (Indian Forest Management Assessment Team (IFMAT) Report 2013 Vol. I) (detailing government fire hazard reduction efforts); Gov't's MTD Ex. H at 227–28, ECF No. 41-8 (IFMAT Report 2013 Vol. II) (detailing updates to the "Indian Affairs Handbooks for Forest and Fire"); Gov't's MTD Ex. C at 65–66, ECF No. 41-3 (Yakama Forestry 2014 Program Review – Tiger Team Report) ("[A]ll slash piles represent a threat to the Yakama forest in the form of excessive fuel loading in the event of a wildfire. . . .  Immediate action should be taken in ensuring that slash pile disposal by burning occurs at a rate equal to the generation of new slash piles. This will ensure that the existing problem does not continue to grow."). These documents suggest, like the duty to replant in *Mitchell IV*, the duties to prevent and suppress wildfires here are not one-time obligations but are instead "ever-present." *Mitchell IV*, 10 Cl. Ct. at 789; *see also Colville*, No. 21-1664, slip op. at 32 ("Given that there is a regular cycle of assessments and reallocation of resources based on changing conditions, it is not clear when the Plaintiff knew or should have known of this alleged breach."); *id.* at 33 ("But this court does not have enough before it to conclusively state that Plaintiff is seeking to recover for the cumulative effect of prior breaches rather than new breaches. . . .  In short, if the evidence shows that the Plaintiff's claims seek to recover for the cumulative effects of old breaches (e.g., the breaches outlined in IFMAT I), then the court can grant judgment accordingly. But the court cannot dismiss this action now based on the limited, pre-discovery record."). The government's duties to prevent and suppress wildfires were therefore not "tied to a fixed point in time" but instead were persistent obligations required by statutes and regulations which the government recommitted to carrying out between 2005 and 2015. *See supra* Sections IV–V; *Mitchell IV*, 10 Cl. Ct. at 789; *Colville*, No. 21-1664, slip op. at 32 ("Given the frequent updates and changes that the Government makes in forest management, it is unclear whether the supposed past mismanagement would put Plaintiff on sufficient notice so that it 'knew or should have known of the [Government's] breach[es].'" (alterations in original) (quoting *Birdbear v. United States*, 162 Fed. Cl. 225, 242 (2022)). Thus, even assuming *arguendo* "[e]ight of the ten allegations that Plaintiffs advance in the Complaint are for alleged mismanagement antedating the Cougar Creek Fire," Gov't's Renewed MTD at 32, the ongoing nature of these duties and plaintiffs' plausible allegations of discrete instances of breach, *see* Tr. at 190:10–23, permit "plaintiffs . . . [to] sue with respect to [alleged breaches from] long ago." *Mitchell IV*, 10 Cl. Ct. at 789; *Brown Park*, 127 F.3d at 1459; *Menominee*, 726 F.2d at 721; *Rosebud Sioux*, 75 Fed. Cl. at 25 ("It cannot be said at this early stage of the litigation that the Complaint does not, or could not, encompass claims that are not barred by the statute of limitations.").

Plaintiffs' concern over repeated litigation over the same breach of duty confirms the Court's finding. Plaintiffs reasonably question whether Tribes must be in a "constant state of litigation over every possible future claim of damages." Tr. at 201:11–17 ("[PLAINTIFFS:] [A]re tribes supposed to be in a constant state of litigation over every possible future claim of damages that might happen regardless of how speculative those are? I think the answer's absolutely not. And the way that we protect ourselves from going down that road is the requirement that you must have damages in order to accrue a claim."); *cf. Portland Mint v. United States*, 160 Fed. Cl. 642, 662–63 (2022) ("[A] statutory construction that causes absurd results is to be avoided if at all possible" (quoting *Timex V.I., Inc. v. United States*, 157 F.3d 870, 886 (Fed. Cir. 1998)), *appeal argued*, No. 2022-2154 (Fed. Cir. Mar. 5, 2024)). Additionally, the existence of a continuing claim is further supported by the government's admission at oral argument "wrongs committed within [the] six-week period [between 30 June 2015 and the start of the Cougar Creek Fire] are actionable." Tr. at 196:5–6; Tr. at 196:7–10 ("[THE COURT:] How about the fire? [GOVERNMENT]: To the extent the fire was . . . exacerbated by actionable conduct occurring within that six-week period, that might be actionable."). If a breach of trust can exacerbate damages from a breach of trust, this weighs in favor of finding the breach "an ever-present one" "not "tied to a fixed point in time." *See Mitchell IV*, 10 Cl. Ct. at 789; *see also Colville*, No. 21-1664, slip op. at 32 ("[T]he fact that the Government may have breached its duties prior to August 2015 does not necessarily preclude Plaintiff's claims for breaches in and after 2015."). As the Court determined there was a plausibly alleged actionable breach of trust, *see supra* Section IV–VI, the Court finds the duties alleged, like those alleged in *Mitchell IV*, to be "ever present" and therefore subject to the continuing claims doctrine; further development of the record is necessary, however, to determine when each duty arose and when breach specifically occurred. *Mitchell IV*, 10 Cl. Ct. at 789; *Brown Park*, 127 F.3d at 1459; *Hopland Band of Pomo Indians*, 855 F.2d at 1577.

## B.     Whether Plaintiffs Waived the Alleged Claims in a 2013 Settlement Agreement

The government argues, even if there is a continuing claim, plaintiffs have waived their right to recover for any claim arising from actions prior to a 2013 settlement agreement. Gov't Renewed MTD at 41. The government explains, "[i]n 2013, the United States and Yakama Nation executed a settlement agreement . . . resolving breach of trust claims relating to the United States' alleged mismanagement of the [Tribe's] monetary and non-monetary trust assets and resources." *Id.* This settlement agreement, entered publicly on the corresponding docket of the United States District Court for the District of Columbia and attached to the government's Motion, states in part:

4. Plaintiff hereby waives, releases, and covenants not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before the date of the Court's entry of this Joint Stipulation of Settlement as an Order and that relate to Defendants' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources. The claims being settled include:

. . . .

   b.  Defendants' alleged mismanagement of Plaintiff's non-monetary trust
   assets or resources, including but not limited to any claim or allegation that:

. . . .

      (4)  Defendants failed to preserve, protect, safeguard, or maintain
      Plaintiff's non-monetary trust assets or resources;

6.  Exceptions to Plaintiff's Release, Waiver, and Covenant Not to Sue.

   . . . .

   k.  Plaintiff's claims, if any, that relate to Plaintiff's non-monetary trust
   resources and that arise under the takings clause of the Fifth Amendment of
   the United States Constitution, provided however any claims that are
   reserved in this subparagraph exclude those (1)(a) that relate to . . .
   Defendants' alleged mismanagement of Plaintiff's timber resources

Joint Stip. of Settlement ¶¶ 4–6, *Nez Perce Tribe v. Jewell*, No. 06-cv-2239 (D.D.C. June 14, 2013), ECF No. 219.  According to plaintiffs, this agreement "paid for the lack of timber yield up to that date in 2013. . . .  And that's it."[11]  Tr. at 216:1–4.  The government, on the other hand, alleges the settlement agreement covered plaintiffs' claims here.  Tr. at 216:5–8 ("THE COURT: And, [government], the argument is that . . . the settlement paid for more than that? [GOVERNMENT]:  Absolutely, Your Honor.").  At oral argument, the government cited to paragraph 6(k) of the settlement agreement, alleging "claims relating to defendants' alleged mismanagement of plaintiffs' timber resources are expressly and explicitly included in the waiver."  Tr. at 216:24–217:2.  Interpretation of "a settlement agreement is an issue of law." *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997) (citing *Mays v. USPS*, 995 F.2d 1056, 1059 (Fed. Cir. 1993)).  "In interpreting a written agreement, [the Court must] first ascertain whether the written understanding is clearly stated and was clearly understood by the parties." *Id.*  The Court accordingly turns to the language of the contract, giving the words of the contract "their ordinary meaning, unless it is established that the parties mutually intended and agreed to some alternative meaning." *Id.* (citation omitted).

   Plaintiffs contend they could not have waived a breach of trust claim for fire prevention and suppression duties because their claim did not accrue until 2015.  Pls.' Resp. at 27.  As indicated *supra*, plaintiffs allege a plausible continuing claim which may extend to breaches of duty up to a decade prior to 2015.  *See supra* Section X.A.  The 2013 agreement, however, explicitly waives "all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown . . . for any damages or any equitable or specific relief, that are based on harms or violations" for the government's "alleged mismanagement of Plaintiff[s'] non-monetary trust assets or resources."  Joint Stip. of Settlement ¶ 4.  The plain language of the agreement therefore indicates plaintiffs waived any claim accruing due to a breach of duty prior to 14 June 2013, the date the court entered the agreement.  According to plaintiffs, the settlement

_____

[11] Plaintiffs argue in their Response:  "Plaintiff Yakama Forest Products was not a part to that settlement and is not bound by its terms."  Pls.' Resp. at 26–27.  At oral argument, however, plaintiffs clarified "Yakama Forest Products is certainly a wholly owned arm of the Yakama Nation government" and acknowledged the agreement is "binding on the Yakama Nation."  Tr. at 210:3–19.  There is nothing in the record to indicate plaintiffs are not "close enough in privity" to both be bound by this settlement agreement.

paid for the "lack of timber yield up to that date in 2013 . . . [a]nd that's it." Tr. at 216:1–4. Plaintiffs' contention does not align with the plain reading of the agreement, however, which indicates plaintiffs waived *all claims* resulting from the government's mismanagement of the forest. Joint Stip. of Settlement ¶ 4. By its plain terms, the agreement accordingly encompasses waiver of any breach of trust claim accruing prior to 14 June 2013. *Id.* Furthermore, Yakama Nation waived damages for "harms *or* violations" occurring before the settlement agreement. Joint Stip. of Settlement ¶ 4. The waiver's disjunctive language accordingly applies to any violations in existence on 14 June 2013, regardless of whether there was harm. *See* Joint Stip. of Settlement ¶ 4; *see also Colville*, No. 21-1664, slip op. at 34 ("Because [the settlement agreement] is phrased in the disjunctive, it applies to any violation that had occurred whether there was any harm at the time of the settlement. Therefore, the court agrees that any alleged breaches of the Government's trust obligations prior to [the effective date] that are covered by the settlement agreement, are barred by the release regardless of whether there was any harm at the time."). Although plaintiffs' breach of trust count is a continuing claim, *see supra* Section X.A, the record is insufficient to establish precisely when plaintiffs' claim accrued.[12] Due to the Yakama Nation's 2013 agreement, however, plaintiffs' breach of trust claim must arise from a breach of duty occurring no earlier than 14 June 2013, the date the agreement was entered. The Court accordingly grants in part the government's Motion to Dismiss to the extent plaintiffs' claim relies on a breach of duty occurring prior to the 2013 settlement agreement. Joint Stip. of Settlement ¶ 4; *see also Colville*, No. 21-1664, slip op. at 34 ("That said, at this stage of the litigation the Court cannot determine how broad this release will turn out to be. . . . To the extent that the parties dispute whether harms were caused by released trust management duties or subsequent acts (or failures to act), that will require a fully developed factual record (and perhaps expert testimony) that is not yet before the Court.").

## XI.  Whether the Doctrine of Claim Splitting Prevents the Yakama Tribe's Claims

The parties disagree whether plaintiffs' claims here are barred due to plaintiffs' ongoing case in *Yakama I*. Notably, the government is not arguing *claim preclusion*, the doctrine preventing parties from relitigating cases involving the same parties and the same facts when a case has reached final judgment. *See Phillips/May Corp. v. United States*, 524 F.3d 1264, 1267–68 (Fed. Cir. 2008). Instead, the government contends any claim for breach of duty for wildfire prevention and suppression are necessarily rooted in a sustained yield claim and must be litigated in *Yakama I*. Gov't's Renewed MTD at 27–30. The government states, "it appears [p]laintiffs' theory . . . is that the principle of management for sustained yield implicitly includes money-mandating, fiduciary duties for fire prevention and suppression. But—even assuming (without conceding) that [p]laintiffs are correct on that point—any alleged breach of a fiduciary duty to provide for sustained yield is already being litigated in [p]laintiffs' forestry case." *Id.* at 29–30. Despite alleging the claims are "already being litigated," however, the government requests no specific relief in its Motion related to this contention. Plaintiffs, on the other hand, assert claim

---

[12] A developed record may particularly clarify the timing of when alleged duties arose, when those duties were breached, and to what extent actions before and after 2013 contributed to the wildfire. *See* Tr. at 220:20–221:7 ("[GOVERNMENT:] [The settlement agreement] only waives claims that accrued prior to [2013], and that would extend to any . . . slash piles that were left prior to this, if it was the United States' responsibility to clean those up in the first place and if, indeed, they were left. . . . [THE COURT:] [C]ould it be that slash piles left after 2013 that caused increased fire risk are part of those then? . . . [GOVERNMENT:] That's theoretically possible, yes. . . . [PLAINTIFFS:] That's our allegation.").

splitting and claim preclusion have identical standards, preventing any remedy from being necessary here. Pls.' Resp. at 19. Plaintiffs propose "[c]laim preclusion applies when '(1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first.'" *Id.* at 19–20 (quoting *Phillips/May Corp.*, 524 F.3d at 1267). The government notably suggests no test in its briefing for claim splitting. When asked at oral argument for the government's proposed standard, the government stated, "I think it's a flexible test because it's entrusted to the trial court's discretion as to the best way to manage the case law in front of it[;] [b]ut I believe that if you have the same transaction or occurrence, with the same parties, the claims should be . . . in one case and not in two[,] [s]o that's the test I propose." Tr. at 177:22–178:3. The government indicated the determination is at the discretion of the Court for "docket management" purposes. Tr. at 180:2–5. Plaintiffs agreed "the entire analysis is about . . . what is the most helpful thing for the Court's docket and the Court exercising discretionary authority to manage its docket." Tr. at 179:23–180:1.

As the parties agree the question of claim splitting is at the Court's discretion for docket management purposes, the Court accordingly turns to the claims at issue to determine whether the claims are similar enough to warrant permitting a second action to continue. *See Lea v. United States*, 120 Fed. Cl. 440, 446–47 (2015) ("Plaintiff[s] [are] already pursuing his claim that the United States breached the loan guarantee in his earlier-filed case. . . . Accordingly, to promote judicial economy and conserve the parties' resources, the court dismisses the breach-of-contract claims set forth in plaintiff's second amended complaint without prejudice."). Plaintiffs allege "the series of transactions that underlie *Yakama I* are those transactions related to the processing of timber sales . . . [w]hereas here, the operative facts are the Cougar Creek wildfire." Tr. at 181:12–22. Plaintiffs argue they are alleging breach of different statutory subsections here than they are in *Yakama I*. Tr. 180:21–181:2 ("THE COURT: Well, . . . assuming claim splitting applies, you're alleging that the government has violated the same statutes and regulations as in *Yakama I*? [PLAINTIFFS]: We are alleging different subsection. But if you're just looking at the . . . overarching statutes, there is overlap, yes."). The government, in contrast, contends "[i]f [] plaintiffs have a claim at all arising out of the Cougar Creek fire, it is that the . . . government conduct before and during that fire caused an underharvest of trees, reduc[ing] . . . the logging revenue that the tribe might have obtained." Tr. at 183:17–21. In this case, the Court finds the money-mandating duties arise under the same statutory and regulatory scheme as in *Yakama I*, yet the duties and damages to wildfire prevention and suppression are distinct from sustained yield alone. *See supra* Sections V–VIII. In *Yakama I*, the Court determined there was a duty "to manage the [Yakama] [F]orest 'in accordance with the principles of sustained yield.'" *Yakama I*, 153 Fed. Cl. 676, 702 (2021) (quoting 25 U.S.C. § 407). In this case, the allegedly breached duties are distinct from an obligation to sustained yield. *See supra* Section V. Plaintiffs acknowledge, "there is the potential for some overlap" regarding the "building up of . . . fuels across the forest." Tr. at 182:21–24. Although the parties may wish to consolidate cases in the future, and although there may be overlap in calculation of damages, there are sufficient factual differences between *Yakama I* and the immediate case. For example, in contrast to damages from sustained yield, this case directly implicates the effect of slash piles on the Cougar Creek Fire and the potential damages which resulted from the fire. *See supra* Sections V–VIII. Both of these issues create sufficiently distinct analyses and potential

damages which do not necessitate dismissal or mandatory consolidation for purposes of "judicial economy and conserv[ation] [of] the parties' resources."  *See Lea*, 120 Fed. Cl. at 447.[13]

## XII.    Conclusion

For the foregoing reasons, the Court **GRANTS in PART** and **DENIES in PART** the government's Renewed Motion to Dismiss, ECF No. 41.  On plaintiff's breach of trust claim, the Court denies in part, finding plaintiffs have pled a plausible and compensable breach of duty. *See supra* Sections V–VIII.  The Court grants in part to the extent plaintiffs' claim relies on a breach of duty occurring prior to a 2013 settlement agreement.  *See supra* Section X.B.  On plaintiffs' takings claim, the Court denies in part to the extent plaintiffs' claim is based on the government's actions resulting in the accumulation of slash piles in the Yakama Forest.  *See supra* Section IX.A.1, B.  The Court grants in part to the extent plaintiffs' claim is based on general forest mismanagement and the reallocation of firefighting resources.  *See supra* Section IX.A.2.  **On or before 3 July 2024** the parties shall file a joint status report including a proposed schedule for further proceedings in this case.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[13] At oral argument, the parties did not take clear positions on the necessity or desire to consolidate.  Tr. at 179:19–180:21 ("[PLAINTIFFS:]  [I]f there's a problem here, I think that it's a problem that is easily remedied by consolidation. . . .  THE COURT:  [Government,] you would agree, then, the discretion of the Court to consolidate could be a remedy?  [GOVERNMENT]:  It could be. . . .  I think the cases are so different that consolidation would not provide any real benefits.  But depending on how the pending motion to dismiss is resolved, that situation may change." ).  To the extent one or both parties wish to consolidate the present case with *Yakama I*, the Court will entertain those arguments upon consideration of a properly filed motion.